**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MIKEISHA BLACKMAN, et al.,       )
                                 )
            Plaintiffs,          )        Civil Action No. 97-1629 (PLF)
                                 )
               v.                )        Claim of Jessica Lewis
                                 )
DISTRICT OF COLUMBIA, et al.     )
                                 )
            Defendants.          )

**REPORT AND RECOMMENDATIONS**
**OF THE SPECIAL MASTER**

**Background**

This report is filed pursuant to the Order of Reference dated February 12,

1999 (Order of Reference) in Blackman v. District of Columbia, Civil Action No.

97-1629 (PLF) (Blackman).  On January 28, 2003, the Court ordered, inter alia, the

District of Columbia Public Schools ("DCPS") to provide Jessica Lewis with special

education and related services as required by the Individuals with Disabilities

Education Act ("IDEA").

On July 6, 2004, approximately eighteen months after the Court's Order of

January 2003, counsel for Ms. Lewis filed a Motion to Show Cause, Motion to

Enforce and Motion for Contempt.  The matter was referred to the Special Master on

July 12, 2004.  On July 22, 2004, Ms. Lewis, counsel for the Ms. Lewis, counsel for

the defendants, attorneys and program staff for the District of Columbia Public

Schools ("DCPS"), and the Special Master participated in a meeting.  At the time of the meeting, Ms. Lewis had been attending, though somewhat sporadically, a program at Spingarn High School.  She was exhibiting behavioral problems, and was having difficulty making transitions from her group home to school, and once at school, back home.  At the meeting with the Special Master, counsel for Ms. Lewis sought an order requiring DCPS to place Jessica in a residential facility or, pending the identification of an appropriate residential facility, at Alternative Path Training School ("APTS") in Alexandria, Virginia, until a residential placement could be found.  Defendants objected to plaintiff's request for a residential placement and noted that counsel had not identified APTS in her Court filing.

During the course of the meeting, a plan was formulated which would require DCPS to fund: 1) a functional behavior assessment ("FBA"); 2) the development of a behavioral intervention plan ("BIP") that could be used both at school and at the group home where Ms. Lewis lived; and 3) training of home and school staff on the use of the plan.  Counsel for Ms. Lewis proposed that these three tasks be performed by APTS.  In return, counsel for Ms. Lewis agreed to participate in another meeting with DCPS to determine an appropriate placement.[1]

DCPS asked for time to review the credentials of APTS personnel before agreeing to the proposed assessment and training sessions.  DCPS was given a day to

---

[1] At the July 22 meeting with the Special Master, the principal of Spingarn readily acknowledged that, in her view, the school was not an appropriate placement for Ms. Lewis.  Inexplicably, at an August 25, 2004, IEP meeting, and again at the September 28, 2004, IEP meeting, DCPS repudiated this conclusion and placed Ms. Lewis back at Spingarn.  Ultimately, a Hearing Officer found Spingarn inappropriate and ordered compensatory education for the period of Ms. Lewis' placement there.

collect references regarding APTS (and make any credible objections) and a week to

arrange a visit by APTS staff to the group home.

By email dated July 23, an attorney in the DCPS Office of General Counsel

consented to APTS' conducting a functional behavioral assessment and developing a

behavioral intervention plan for Ms. Lewis.  On July 27, 2004, the attorney sent the

following message by electronic mail to Ms. Lewis' counsel:

> I received your voice mail message regarding funding for the Functional
> Behavioral Assessment and the development of a Behavioral Intervention
> Plan by Alternative Paths for Jessica Lewis.  Please note that DCPS has
> typically reimbursed independent evaluators in the neighborhood of 560.00
> for FBAs.  Additionally, it is my expectation that the BIP would be invoiced
> in the same range.

After several other communications between the parties, the Special Master

advised both parties as follows:

> The amount to be paid to Alternative Paths for Jessica's FBA/BIP will be
> contained in a proposed Court Order that I will file with the Court as soon as
> the services have been furnished.  DCPS may argue what it "typically" pays
> for such services, and if the invoice exceeds that amount, Ms. Alvarez may
> argue exceptional circumstances.

The Special Master monitored the progress of APTS efforts to evaluate Ms.

Lewis and provide staff training during August and September of 2004.[2]  However,

on September 23, 2005, the Special Master was informed that Ms. Lewis had been

admitted to the psychiatric unit of Greater Southeast Hospital.  On or about the same

date, counsel for Ms. Lewis requested an administrative due process hearing seeking

---

[2] Additionally, DCPS provided compensatory education in the form of tutoring to Ms. Lewis during
this period.

a residential placement for Ms. Lewis.  When Ms. Lewis was discharged from the

hospital, she was transported to Florida to enroll in the Florida Institute for

Neurological Rehabilitation ("FINR").  In January, a Hearing Officer found that: 1)

DCPS had failed to meet its burden that the Spingarn Center program was reasonably

calculated to provide educational benefits to the student; 2) FINR is an appropriate

placement that offers a program that is reasonably calculated to provide educational

benefits; and 3) DCPS met its burden of proof that it implemented the August 2004

Behavior Plan.  With respect to this last finding, the Hearing Officer stated:

> The MDT team agreed to the Behavior Plan of August and recommended the school and transportation staff at Spingarn Center be trained in that plan.  Mr. El Tagi trained the DCPS staff on the Behavior Plan on September 14 and 15 and the staff began to implement the plan at school.  The student, however, withdrew from school four days after attending in September and therefore did not give DCPS an opportunity to fully implement the Behavior Plan.

The Hearing Officer Decision ("HOD") ordered DCPS to fund and place Ms.

Lewis at FINR from her date of enrollment until the end of the 2004-2005 school

year.

No further information was received regarding Ms. Lewis until counsel filed

a Motion for Payment of Fees on June 8, 2005.  With that Motion, counsel attached

two invoices from APTS.  The first invoice, identified as Invoice #155, totaled

$3,036.60 for services rendered in conducting the functional behavior assessment

and developing the behavioral intervention plan.  The second invoice, identified as

Invoice # 177, totaled $3,148.80 for training school, transportation and residential

staff.  In response to the Motion for Payment of Fees, defendants filed an Opposition.

The defendants' objections were two-fold.  First, defendants' argue that payments are limited by DCPS Superintendent Directive 530.6 which sets forth maximum hourly rates and maximum total amounts to be paid by DCPS for eleven (11) types of independent education evaluations (e.g., psycho-educational, speech and language, psychiatric).  Neither functional behavior assessments nor behavioral intervention plans are listed in the Directive.  The maximum hourly rate is $110.00 (applicable in seven of the eleven categories); the highest maximum amount is $1650.00 for a neuropsychological evaluation. [3] .

This report and recommendation addresses the plaintiff's request for fees.  To the extent that Ms. Lewis has maintained a claim  that DCPS is in contempt for violation of the January 2003 Court Order, it is the recommendation of the Special Master that such claim be denied.  As indicated above, no information was received regarding Ms. Lewis for eighteen months following the issuance of the January 2003 Court Order. During this time, Ms. Lewis was free to proceed to an administrative due process hearing (as she ultimately did).  While a Hearing Officer ultimately found that DCPS' placement had not been appropriate, it would be imprudent to find that such an error amounts to contempt of an Order directing DCPS to provide special education.  Moreover, the failure of Ms. Lewis to access administrative procedures for more than twenty months after the issuance of the January 2003 Court Order should not be used to indict DCPS on more serious grounds.

---

[3] It should be noted that the amount cited by DCPS counsel -- $560.00 – is listed on Directive 530.6 as the ma ximum for occupational and physical therapy evaluations.

**Recommendations with respect to Invoices 155 and 177.**

To the extent the defendants argue that a functional behavioral assessment and a behavior plan are subject to the Superintendent Directive 530.6,[4] the June 8, 2005, Motion for Payment of Fees, will be treated as plaintiff's argument for exceptional circumstances.   Similarly, the facts will be viewed in light of the defendants' contention that the expenditure must meet 5 D.C.M.R. 3027.5 which requires that plaintiffs demonstrate "unique circumstances justifying the payment of cost exceeding the established maximum rates or amounts."[5]

1. Without regard to any person or institution's" fault" or "neglect," Ms. Lewis' cognitive and behavioral issues are complex.  Since the number of students with Ms. Lewis' level of retardation is only a small fraction of students with disabilities served by DCPS, one can infer that the services DCPS has "typically reimbursed" independent evaluators for functional behavior assessments and behavioral intervention plans may be inadequate for student with Ms. Lewis' disabilities.[6]

2. Defendants were on notice that a functional behavior assessment and behavioral intervention plan would take longer than other evaluations, such as physical therapy or occupational therapy assessments.  At the meeting with the Special Master, counsel for Ms. Lewis stated that a "good functional

---

[4] As noted above, Directive 530.6 does not specifically address either of these services.

[5] Defendants have not provided any support for their argument that this provision applies, but for the sake of argument.

[6] It is important to note that defendants introduced no evidence as to the number of independent FUNCTIONAL BEHAVIOR ASSESSMENT's that have been conducted or the severity of the disabilities of the students assessed.

behavioral assessment of a child with long-engrained problematic behaviors takes anywhere from two to four weeks." (TR. 60). The invoice submitted by APTS reflected a total of 5.5 hours of observation, 4.5 hours of data analysis and 15 hours of plan development over a two-week period. Given the estimate made on July 22, an invoice for twenty-five hours is not unreasonable.

3. With respect to staff training, APTS spent fewer than twenty-five hours training school, transportation and home personnel. Both the number of hours of training, and the location of the training, were reasonable. Despite the protests of the defendants, training individuals at a student's home can be a related service under the IDEA. See Claimant's Reply to Defendant's Opposition to Motion for Payment of Fees, see also Irving Independent School District v. Tatro, 468 U.S. 883 (1984).[7] Moreover, the need to train staff at Ms. Lewis' group home was discussed at length at the July 22 meeting in that one of Ms. Lewis' behavioral problems was her difficulty making transitions from home to school.

4. The experience and qualifications of Ms. Gross are of such a nature that an hourly fee of $105.00 is reasonable. This fee is slightly less than the maximum permitted by Directive 530.6 for services that would be rendered by professionals with comparable degrees and licenses (e.g., professionals

---

[7] As in Irving Ind. Sch. Dist v. Tatro, Ms. Lewis could not benefit from special education without trained residential staff who could induce her, through the implementation of a meaningful behavior plan, to attend school each morning.

who administer educational evaluations).

5. The January 2005 HOD found that the behavioral intervention plan was in use by the residential facility Ms. Lewis was attending so other educational professionals have endorsed its value.

Although DCPS has an obligation to fund both the functional behavior assessment and the behavioral intervention plan, deductions from the invoices presented are recommended as follows:

1. Given the fact that as of July 22, 2004, APTS had sufficient information regarding Ms. Lewis to offer her a full-time school placement, it was not reasonable to then bill DCPS for over two hours of work "[r]eviewing historical documentation" and the sum of $254.10 should be deducted from invoice #155.

2. Invoice #155 includes $44.10 for conversations with counsel for Ms. Lewis. As counsel does not provide special education or related services to Ms. Lewis, she is not a necessary participant to in the conduct of a functional behavior assessment.

3. On invoice #155, phone calls were billed at $105.00 per hour instead of $75.00 per hour, billed on invoice #177.

4. On invoice #177, $411.75 was billed as consultation during "phone conferences" between September 1 and September 19 and $99.00 for "phone conferences" between September 19 and September 30.  Without more specific information, DCPS should not be required to pay for such

consultation.

5. On invoice #177, $150.00 was billed for a telephone conference with the Special Master and counsel for both parties on September 24, 2004.  Counsel for the plaintiff reque sted APTS' participation on the teleconference but this participation was unrelated to the development or implementation of the behavior plan and not covered by the parameters of the July 22 meeting before the Special Master.  Moreover, as of the date of the teleconference, Ms. Lewis was no longer attending a DCPS school.

For these reasons, it is the recommendation of the Special Master that the Motion for Preliminary Injunction be GRANTED.  A proposed order is attached hereto.

RESPECTFULLY SUBMITTED,


Elise T. Baach
Special Master


Date:

9