**FILED**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AUG 2 4 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

)
MIKEISHA BLACKMAN, et al.,           )
      Plaintiffs,                   )
v.                                   )    Civil Action No. 97-1629 (PLF)
                                     )    Consolidated with
DISTRICT OF COLUMBIA, et al.         )    Civil Action No. 97-2402 (PLF)
      Defendants.                   )
                                     )

## CONSENT DECREE

**ON BEHALF OF PLAINTIFFS:**

Ira Burnim Bar No. 406154
Tammy Seltzer Bar No. 453115
Bazelon Center for Mental Health Law
1101 Fifteenth Street, NW Suite 1212
Washington, DC 20005-2005
Phone: (202) 467-5730 x129

Alisa H. Reff Bar No. 423113
DRINKER BIDDLE & REATH LLP
1500 K Street, NW Suite 1100
Washington, DC 20005-1209

Charles Moran Bar No.970871
601 Pennsylvania Ave., NW
Suite 900, South Building
Washington, DC 20004

**ON BEHALF OF DEFENDANT-
INTERVENORS**

Lisa Coleman
General Counsel
Office of Administrative Hearings
441 4th Street, NW, Suite 870N
Washington, DC 20001
Phone: (202) 724-5477

**ON BEHALF OF DEFENDANTS:**

Robert Spagnoletti
Attorney General of the
District of Columbia

George C. Valentine
Deputy Attorney General
Civil Division

Edward Taptich
Chief, Equity Section II

Daniel A. Rezneck Bar No. 31625
Senior Assistant Attorney General
Equity Section II

Cary D. Pollak Bar No. 055400
Senior Assistant Attorney General
Equity Section II
441 4th Street, NW
6th Floor South
Washington, DC 20001
Phone: (202) 724-6604

July 26, 2006

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................ 1
    A. Procedural History ............................................................................ 1
    B. Document Description......................................................................... 7
    C. Goals And Objectives......................................................................... 8

II.  THE PARTIES.................................................................................................. 10
    A.   The Plaintiffs.................................................................................... 10
    B.   The Defendants ................................................................................ 11

III. DEFINITIONS................................................................................................... 11

IV. SETTLEMENT PROVISIONS ....................................................................... 16
    A.   Defendants Will Timely Issue HODs and SAs................................ 16
    B.   Resolution Sessions ......................................................................... 19
    C.   Defendants Will Timely Implement HODs and SAs........................ 22
    D.   Student Hearing Office ..................................................................... 27
    E.   The Office of Administrative Hearings ........................................... 32
    F.   Defendants Will Maintain an Accurate Data System. ..................... 32
    G.   Defendants Will Maintain a Parent Service Center. ........................ 36
    H.   Defendants Will Revise Principal and Teacher Evaluations and
         The Parent Evaluation Form. ...................................................... 37
    I.   Compensatory Education for Class Members................................... 38

V.  CONSENT DECREE OVERSIGHT AND ENFORCEMENT........................ 45
    A.   A Monitor will be Appointed to Monitor and Report to the Court
         on the Implementation of this Consent Decree.......................... 45
    B.   Monitor's Access to Information and Communications ................... 47
    C.   Defendants' Agreement with the Monitor........................................ 48
    D.   Evaluation Team ............................................................................... 51
    E.   Alternative Dispute Resolution (ADR) Procedure .......................... 54
    F.   Defendants' Agreement with the ADR Specialist............................ 58

VI. REPORTING .................................................................................................... 59

    A.   The Defendants Will Provide the Following Reports ...................... 59
    B.   Class Counsel Will Circulate the Following Reports....................... 61
    C.   Access to Records for Verification Purposes .................................. 61

VII. NOTICE OF PROPOSED CONSENT DECREE AND DISSEMINATION
    TO DCPS STAFF ............................................................................................ 62

# TABLE OF CONTENTS
## (Continued)

VIII. MISCELLANEOUS PROVISIONS ................................................................. 63

    A.    Res Judicata Effect: Relief Available to Plaintiffs and Class
           Members ................................................................................... 63

    B.    Commitment of Resources.......................................................... 64

    C.    Parties Agree to Defend Consent Decree on Appeal ...................... 64

    D.    Effective Date ........................................................................... 64

    E.    Anti-Deficiency Act.................................................................... 65

    F.    Procurement ............................................................................. 65

    G.    Amending the Consent Decree .................................................... 65

    H.    Severability .............................................................................. 65

    I.    Consistency............................................................................... 66

IX. ATTORNEYS' FEES .................................................................................. 66

    A.    Plaintiffs are Entitled to Attorneys' Fees...................................... 66

    B.    Plaintiffs' Attorneys' Fees for Monitoring ..................................... 66

X. TERMINATION OF LITIGATION................................................................... 67

    A.    Termination of Blackman Case..................................................... 67

    B.    Termination of Jones Case ........................................................... 68

    C.    Termination of Consent Decree .................................................... 69

XI. STUDENTS IN CHARTER SCHOOLS............................................................ 69

XII. CONTINUING JURISDICTION.................................................................... 70

EXHIBITS

A.     ACTION PLAN
B.     DECLARATION OF EDUCATION
C.     STUDENT HEARING OFFICE STANDARD OPERATING PROCEDURES MANUAL
D.     REBECCA KLEMM'S CURRICULUM VITAE
E.     COMPENSATORY EDUCATION CATALOG
F.     AMY TOTENBERG'S CURRICULUM VITAE
G.     CLARENCE SUNDRAM'S CURRICULUM VITAE

The Court orders, and the parties agree:

## I.      Introduction

### A.      Procedural History

The Plaintiffs brought this litigation in July and October 1997,[1] alleging violations of

their constitutional rights and their right to a free and appropriate public education afforded by

the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. and 42

U.S.C. § 1983. In the complaint, Plaintiffs alleged that the District of Columbia Public Schools

("DCPS") failed to: (a) provide due process hearings within 35 days of receipt of a hearing

request, pursuant to 5 DCMR § 3021.5, and Hearing Officer Determinations ("HODs") within

forty-five (45) days of receipt of a hearing request, pursuant to 20 U.S.C. § 1415, et seq., as it

then read, and (b) timely implement HODs and Settlement Agreements ("SAs"). The matter was

certified as a class action under Fed. R. Civ. P. 23 (b)(2) on October 21, 1997, and May 13,

1998.[2]

Following submissions by both parties, the Court granted summary judgment on liability

on Plaintiffs' behalf on June 3, 1998. At that time, the Court urged the parties to seek a remedial

plan to address the shortcomings in DCPS' special education program highlighted by the

---

[1] *Blackman, et al. v. The District of Columbia, et al.* was filed on July 17, 1997, alleging that the Defendants had failed to timely hold hearings and issue Hearing Officer Determinations in response to requests for due process hearings submitted by special education students in the District of Columbia under the Individuals with Disabilities Education Act. *Curtis, et al. v. The District of Columbia, et al*. was filed on October 16, 1997, alleging that the Defendants failed to timely implement Hearing Officer Determinations and Settlement Agreements that were executed in lieu of holding a due process hearing. Subsequently, during the litigation of the Curtis matter, the case was renamed *Jones*. The *Blackman* and *Jones* cases were consolidated on November 14, 1997. This Consent Decree is being filed in both cases.

[2] The *Blackman* subclass was certified on October 21, 1997 and the *Jones* subclass was certified on May 13, 1998.

Section I.A. (cont'd)

litigation. The parties, after extensive consultations, entered into a Settlement Agreement on June 24, 1999 to resolve all issues raised in the class action. Following a fairness hearing, and to address comments made during that hearing, the parties on December 10, 1999 entered into a Revised Settlement Agreement. Although the Revised Settlement Agreement received Preliminary Approval from this Court, it was never granted Final Approval.

The Revised Settlement Agreement set forth specific dates by which the Defendants would clean-up the backlog of unscheduled hearings and unimplemented HODs and SAs and come into compliance with various requirements of IDEA that are at issue in this lawsuit. In addition, the agreement required the Defendants to set up an electronic database (now referred to as ENCORE) to track basic information about special education students and to implement certain programs for special education students that would increase the capacity of the Defendants to serve special education students within the public schools.

For nine months after the Revised Settlement Agreement was executed, the Defendants made progress in meeting some of the agreement's requirements, primarily the Blackman provisions. Specifically, the backlog of 898 hearing requests that existed at the time of the settlement agreement was eliminated in its entirety. As of September 2000, the vast majority of due process hearings were being scheduled in a timely manner. However, the Defendants had not demonstrated the same success with regard to the Jones portion of the case. As a result of the Defendants' failure to fully comply with the terms of the Revised Settlement Agreement, the parties entered into a Supplement to the Revised Settlement Agreement on September 28, 2000, giving the Defendants additional time in which to comply with the Jones portion of the agreement. The Supplement set a short schedule for resolving the new backlog of HODs and SAs that had developed in the preceding year.

Section I.A. (cont'd)

Subsequently, the July 2001 quarterly report submitted to class counsel revealed that the Defendants failed to meet the terms of the Supplement, citing more than 300 overdue HODs and SAs.  In addition, the Blackman backlog, which had been successfully eliminated for months, reappeared, with 69 pending overdue hearing requests. On August 10, 2001, the Plaintiffs requested a trial date to resolve the issue of remedy, but the request was not granted. By January 2002, the Blackman backlog had increased to over 300 cases and the Jones backlog had also increased.

On January 25, 2002 the parties jointly filed a request for this Court to refer this case to mediation, which the Court granted. On September 4, 2003, the parties filed a Consent Decree for both Blackman and Jones, which was a result of that mediation.  Prior to the commencement of the formal mediation that led to the 2003 Consent Decree, the Plaintiffs retained an expert, Dr. Thomas Hehir, to provide an assessment of the Defendants' special education system to ascertain the obstacles to resolving the issues at the heart of this litigation.[3]  After reviewing Dr. Hehir's initial findings (Hehir Report I), the Defendants then retained Dr. Hehir to perform a more extensive evaluation and to provide recommendations for management that would, among other things, allow the Defendants to provide both timely due process hearings and timely implementation of HODs and SAs. (Hehir Report II).[4]

---

[3] Dr. Hehir served as Director of the Office of Special Education Programs at the U.S. Department of Education from September 1993 to 1999. Prior to his federal appointment, Dr. Hehir was responsible for overseeing the delivery of special education services in the Boston and Chicago public schools. Dr. Hehir is now the Director of the School Leadership Program and a Professor of Practice at Harvard University.

[4] For the second report, Dr. Hehir assembled a team of doctoral students to collect data through interviews, data review, and observation. In total, the study team conducted 75 interviews.

Section I.A. (cont'd)

Dr. Hehir's expert reports provided the framework for the September 4, 2003, Consent Decree. Most significantly, Dr. Hehir concluded that "the problems associated with due process goes [sic] to the core of the district's inability to execute many of its responsibilities under special education." (Id. at 4.) Based on Dr. Hehir's findings, the 2003 Consent Decree was organized not just to require absolute deadlines resolving the ultimate IDEA due process issues, but also to include requirements for activities and measurable outcomes that have a direct effect on the Defendants' ability to meet those deadlines.

In the second report, Dr. Hehir emphasized that "the district's inability to manage due process was largely due to larger systemic failures in special education." (Hehir Report II at 3). To be ultimately successful in holding timely hearings and implementing HODs and SAs, Dr. Hehir posited, the Defendants must develop a vision of management goals with measurable outcomes for students with disabilities. Dr. Hehir also stressed the importance of managing information: "The continued implementation and use of a state-of-the-art data system to track special education related events will support DCPS in its efforts to develop strategic goals and monitor progress towards achieving those goals." (Id.). The 2003 Consent Decree built upon the earlier agreements by requiring the automation of due process information and implementation of a module within the SETS[5] system to provide an early warning for lapses in the delivery of related services.

Dr. Hehir "urged" the Defendants to use the recommendations in his report "as part of a continuous, data-driven improvement process to move the system towards full compliance with IDEA and address the deficiencies noted in the Blackman/Jones lawsuit." The parties relied

---

[5] SETS was the predecessor to ENCORE.

Section I.A. (cont'd)

significantly on Dr. Hehir's expertise in drafting the 2003 Consent Decree in the hope of creating

an agreement under which the Defendants would successfully resolve the underlying obstacles to

holding timely hearings and implementing HODs and SAs and thereby resolve the ultimate

issues in this case.

On May 22, 2003, the Office of Administrative Hearings ("OAH") moved to intervene in

the Blackman case on the grounds that the Consent Decree contained terms and requirements

that OAH found objectionable and contrary to its interests and statutory reform mandate as a

new, independent central administrative tribunal in the District of Columbia.  The Plaintiffs

opposed the motion, and the Defendants took no position, later stating that they did not object to

the intervention.  On September 4, 2003, the parties submitted a proposed Consent Decree.  On

March 29, 2004, because the proposed Consent Decree contained provisions pertaining to OAH,

the Court granted OAH's motion to intervene in the Blackman case.  On June 9, 2004, the Court

denied the parties' motion for Preliminary Approval of the September 4, 2003 Consent Decree

without prejudice to its renewal.

On July 15, 2003, as referenced in the September 4, 2003 proposed Consent Decree,

DCPS reported to class counsel that all students who requested a due process hearing on or

before January 31, 2003 had completed their hearings and one member of the class who waived

the 45 day timeline was awaiting a Hearing Officer's Decision.  On August 15, 2003, DCPS

reported to class counsel that all students who requested a due process hearing before January 31,

2003, had been issued a Hearing Officer's decision.  Under the 2003 Consent Decree, the

Defendants were required to take whatever measures were necessary to eliminate 95% of the

Jones initial backlog, as defined by the Decree, by no later than January 31, 2004. Defendants

reported to class counsel that DCPS eliminated more than 95% of the Jones initial backlog by the

Section I.A. (cont'd)

January 31, 2004 deadline.  Class counsel confirmed these reports through various

communications with members of the special education bar.

Subsequent to the filing of the September 4, 2003 Consent Decree, and the Court's denial

of Preliminary Approval, the parties engaged in further discussions as to the issues presented in

both the Blackman and Jones cases, with a view to agreeing to certain modifications in the

September 4, 2003 Consent Decree.  To assist the parties in the process, with the consent of the

parties, the Court appointed the Honorable David S. Tatel, Judge of the United States Court of

Appeals for the District of Columbia Circuit, and Amy Totenberg of Atlanta, Georgia, an

experienced attorney in special education matters, as joint mediators.

A period of intensive mediation ensued, resulting in a new Consent Decree.  This

Consent Decree was based on the framework of the September 4, 2003 Consent Decree with

certain modifications agreed to by the parties, reflecting: changes in the IDEA and its

implementing regulations; changes in the DCPS, including the appointment as Superintendent of

Dr. Clifford B. Janey, who actively participated in the Tatel-Totenberg Mediation; input from the

special education bar elicited by class counsel;[6] guidance from the District Court; other changed

circumstances in the field of special education and the capacity of the DCPS to address problems

in the delivery of special education; and other factors.

As of March 1, 2006, Defendants reported that there were no overdue hearing requests

pending.  With respect to the Jones portion of the case, the Defendants reported there were 3,691

---

[6] The special education bar is not a single organization speaking with a unified voice; rather, it consists of individual attorneys, primarily solo and small firm practitioners, and public interest attorneys working for non-profit organizations and law school clinics. Although members of the special education bar often expressed similar concerns, they did not always agree on priorities or solutions. Within the context of mediation, class counsel worked diligently to address the bar's concerns and to reconcile differences of opinion.

Section I.A. (cont'd)

outstanding HODs/SAs of which 2,521 were overdue for implementation; of these 3,691 cases

there were 1,333 outstanding SAs, of which 738 were overdue, and 2,358 HODs of which 1,783

were overdue.[7]

In December 2005, the parties submitted the new Consent Decree to the Court. After a

fairness hearing, the Court declined to approve the Consent Decree. The Court asked the parties

to negotiate changes to the 2005 Consent Decree. The negotiations produced the instant Consent

Decree.

## B.        Document Description

The Consent Decree has 12 sections and several exhibits. The exhibits are not

enforceable obligations unless specifically designated as such in the body of the Decree.

The Decree references the IDEA numerous times. While this Decree was being

negotiated, the IDEA was reauthorized in 2004 to take effect July 1, 2005. The most significant

change in IDEA '04 that affects this Decree involves a new provision requiring resolution

---

[7] During the summer of 2005, DCPS transitioned from using the SETS data system to using ENCORE. This transition has affected DCPS' ability to timely input data. DCPS is current in entering actions ordered in HODs and SAs into ENCORE. Further, an alternate mechanism was developed to address closure of cases entered into the data system prior to December 7, 2005. As this alternate mechanism is not "real time," there are some reporting delays regarding closure. These reporting delays will be resolved once all cases prior to December 7, 2005 are closed. The backlog reported by DCPS may not comport with the numbers reported to the Office of Special Education Programs ("OSEP") of the United States Department of Education because the OSEP reports are based on a different formula and reporting time period.

Section I.B. (cont'd)

sessions ("RS") between the parties to a formal complaint.  The law requires this session to be

held within 15 days of a complaint or request for a due process hearing, unless waived in writing

by the parties to the RS.  The RS requirement changes the timeline for holding due process

hearings and issuing HODs.  While IDEA '04 broadly outlines the new process, in some

instances changing the process from 45 days to 75, more details are expected in the

implementing regulations. The RS implementing regulations have not been promulgated.  In

most cases, therefore, the Decree references the IDEA '04 statute rather than the regulations.  The

parties will jointly seek modification of the due process hearing provisions of this Decree should

the final regulations require any revisions.

## C.      Goals and Objectives

The goal of this Consent Decree is to achieve, as quickly as possible, Defendants'

compliance with federal law requirements for timely due process hearings and timely

implementation of Hearing Officer Decisions and Settlement Agreements.  The parties' goal is

for the Defendants to achieve and maintain timely due process hearings and timely

implementation of HODs and SAs in all instances, while understanding that perfection is neither

possible nor required under this Decree.

As experts have noted, the Defendants must meet larger objectives in order to both

satisfy the provisions of this Decree and IDEA and to maintain compliance in the longer term.

Maintaining timely hearings will be extremely challenging unless the Defendants are able to

reduce formal complaints, which can be achieved through various means, such as: improving

service delivery; increasing accountability for educating students with disabilities; creating other

mechanisms for addressing parent concerns; and improving relations among parents, advocates,

and the school system.

Section I.C. (cont'd)

The Consent Decree attempts to address some of these fundamental issues.  For example, the Decree provides for the creation and maintenance of community-based Parent Service Centers, where parents can get more information about their child's disability and IDEA and receive assistance in addressing concerns they have about their child's education before a formal complaint is filed.  The Decree also contains provisions regarding data management, ensuring that the Defendants have the technology to identify service delivery interruptions on an individual and systemic basis and to respond to them in a timely manner.  However, the Defendants recognize that there are important goals that must be met which are not directly addressed in this Decree.

Approximately one-third of all hearing requests involve allegations of untimely assessments and IEPs.  Defendants acknowledge that addressing these problems is an integral strategy in meeting their obligations under the Decree.  The District Government has committed to supplementing the DCPS special education budget to support implementation of performance measures that would address untimely assessments and IEPs, performance measures that are outlined in the Action Plan developed by DCPS to address this litigation (hereinafter the "Action Plan," attached to this Consent Decree as Exhibit A).  Although the Action Plan's performance measures are not enforceable under this Consent Decree, Defendants recognize that meeting the performance measures will have a direct impact on their ability to exit the Blackman/Jones suit.  At the same time, Defendants acknowledge that general continued improvement in DCPS' special education program is necessary to sustain improvements resulting from successfully implementing the terms of the Consent Decree and the Action Plan.  In addition, the Superintendent, in his Declaration of Education and Master Education Plan, (Exhibit B) has

Section I.C. (cont'd)

committed to providing a "continuum of model special education programs" to further

improvements in the delivery of special education instruction.

The parties understand that this Decree is a "living" document, in the sense that they have

tried to create a Decree that can adapt to some of the changes and challenges they expect during

its implementation.  For example, once the Defendants have addressed the issue of timely

evaluations and timely IEPs, as detailed in the Action Plan, the next challenge to timely

implementation of HODs and SAs may be appropriate placements to meet the IEPs'

requirements.  The Consent Decree contains language that may allow DCPS, under certain

conditions, to shift the additional funds from evaluators to other personnel or items that will

better address the placement issue.  The parties intend the Monitor, who will be appointed

pursuant to this Consent Decree, to play an integral role in helping the Defendants achieve

compliance with this Decree while also assisting the Court in holding them accountable for non-

compliance.

## II.        The Parties

### A.        The Plaintiffs

The plaintiff class consists of two subclasses. The first subclass (referred to as the

"Blackman class") is:

> "All persons now [as of January 1, 1995], and in the future, who present
> complaints to DCPS pursuant to Section 615(b)(6) of the IDEA and whose
> requests for impartial due process hearings under Section 615(f) of the
> IDEA and D.C. Mun. Reg. Tit. 5 § 3021.5 are overdue according to these
> provisions; and their next friends."

The second subclass (referred to as the "Jones class") is defined as:

> "All children, now [as of January 1, 1995] and in the future, who are
> entitled to have DCPS provide them with a free appropriate public
> education (FAPE) and who have been denied same because DCPS either

Section II.A. (cont'd)

      (a) has failed to fully and timely implement the determinations of hearing officers, or (b) failed to fully and timely implement agreements concerning a child's identification, evaluation, educational placement, or provisions of FAPE that DCPS has negotiated with child's parent or education advocate."

There is no election available to opt out of either class, pursuant to Fed. R. Civ. P. Rule 23(b)(2).

## B.    The Defendants

The Defendants in this litigation include the District of Columbia, the District of Columbia Public Schools ("DCPS"), the Superintendent of the District of Columbia Public Schools, and the Director of Special Education for the District of Columbia Public Schools. The latter two Defendants are sued in their official capacities only.

The defendant-intervenor, the Office of Administrative Hearings ("OAH"), is the District of Columbia's independent central administrative hearing tribunal created by the Office of Administrative Hearings Establishment Act of 2001 (D.C. Law 14-76). This Decree contains provisions that do not affect OAH. OAH is bound only by certain provisions in this Decree as noted herein.

## III.    Definitions

The terms used in this Consent Decree and Exhibits, unless otherwise defined, have the common meanings or meaning as defined in the Individuals with Disabilities Education Act, as amended by Public Law 108-446, December 3, 2004.

1.    The term "ADR Specialist" refers to individuals appointed by the Court to oversee implementation of the Alternative Dispute Resolution ("ADR") provisions of this Consent Decree.

Section III. (cont'd)

2.      The term "Blackman portion of the case" refers to that part of the case dealing with Defendants' failure to timely hold due process hearings under § 1415 of IDEA, 5 DCMR § 3030, or any other applicable regulation.

3.      The term "Central Administration" refers to the non-school based administrative personnel of the District of Columbia Public Schools.

4.      The term "days" refers to calendar days unless otherwise stated.

5.      The term "Defendants" means the Defendants as identified in Section II.B and does not include the Office of Administrative Hearings.

6.      The term "District" refers to the District of Columbia government.

7.      The term "Hearing Officer Determinations" ("HOD") refers to determinations issued by a Hearing Officer ("HO") following a due process hearing conducted pursuant to § 1415 of IDEA, 5 DCMR § 3030 and other applicable regulations.

        a.      An "outstanding" HOD is an HOD that has one or more "outstanding provisions."  An outstanding provision is one that is: i) not yet due for implementation (e.g., an HOD issued in January ordering DCPS to provide services during the summer), or ii) unable to be implemented because DCPS is waiting for the parent to provide a necessary precursor to implementation (e.g., an HOD ordering DCPS to convene an Individualized Education Program ("IEP") meeting within 10 days after receiving an independent evaluation from the parent) and DCPS has made diligent efforts to obtain the necessary precursor.

        b.      An HOD is "overdue" for implementation when any one of its provisions has not been implemented within the time period specified in the HOD and that provision is not "outstanding" as defined in 7a above. An HOD may be overdue and yet have one or more outstanding provisions.

Section III. (cont'd)

c.      For complaints filed prior to July 1, 2005, an HOD was "timely" when it was issued within 45 days of the complaint or request for a due process hearing, except when an extension of time for issuance of the HOD had been granted for good cause or when a parent had waived his/her right to a timely hearing.

d.      As of July 1, 2005, an HOD is timely when it is issued:

i.  if the parties to the individual case have mutually waived an RS: within 10 days of a hearing or within 75 days of the complaint or hearing request, whichever is earlier,

ii.  if a RS was not noticed and conducted by the Defendants within 15 days of the complaint: within 60 days of the complaint or hearing request unless otherwise agreed by the parties to the individual case; or

iii.  if an RS has been conducted within 15 days of the complaint: within 75 days after the filing of the complaint or hearing request,  unless otherwise agreed to by the parties to the individual case.

8.      The term "Settlement Agreements" ("SAs") refers to agreements entered into by DCPS and parents or parent representatives who request a due process hearing, including Settlement Agreements that may result from mediation or Resolution Sessions. A settlement agreement ("SA") is "overdue," "outstanding," or "timely" according to the rules in paragraph 7 above for HODs.

9.      The term "Jones portion of the case" refers to that portion of the case dealing with Defendants' failure to timely implement Hearing Officer Determinations and Settlement Agreements.

Section III. (cont'd)

10.     The term "Jones initial backlog" consists of Hearing Officer Determinations and Settlement Agreements issued before March 1, 2006 that are overdue.

11.     The term "Jones subsequent backlog" consist of HODs and SAs, issued on or after March 1, 2006, that are overdue.

12.     The term "Monitor" refers to the individual appointed by the Court to monitor implementation of and compliance with this Consent Decree.

13.     Whenever a "Notice" is sent to parents of class members under this Consent Decree, the notice shall be sent in the language(s) required by local and federal law. Whenever a "Notice" to class counsel or Defendants' counsel is required under this Consent Decree, the parties shall serve the notice to counsel of record both by e-mail, including all documents to which a response is permitted or required, and by mail. When service is made on the Defendants, the original e-mail is to be sent to the Attorney General's office with a copy to the General Counsel of DCPS and the Director of Special Education of DCPS. A copy of all notices and filings required to be served on counsel to the parties under the Blackman portion of this Decree shall be served on defendant-intervenor by e-mail to the General Counsel of the Office of Administrative Hearings.

14.     The terms "Office of Administrative Hearings" and "OAH" mean the defendant-intervenor identified in Section II.B.

15.     The term "outside of work hours" means before 8:00 am or after 6:30 pm.

16.     The term "parent" has the meaning of "parent" under 20 U.S.C. § 1401(23) of the IDEA and its implementing regulations.

17.     The term "parent representative" includes attorneys and non-attorney advocates.

18.     The term "parent service center" refers to the community-based parent service

Section III. (cont'd)

center for parents of students, including special education students, described at paragraphs 67-69.

19.     The term "parties," unless otherwise stated, refers to the Plaintiff class and the Defendants. It excludes the Office of Administrative Hearings, unless otherwise stated.

20.     The term "plaintiff" is defined in Section II.A.

21.     The term "related services" shall have the meaning of "related services" under 20 U.S.C. § 1401(26) of the IDEA and its implementing regulations, except that transportation services shall be excluded.

22.     The term "Resolution Session" ("RS") refers to the resolution sessions as defined by IDEA '04 and its implementing regulations.

23.     The term "schools" refers to all schools serving District of Columbia special education students, including, but not limited to DCPS schools, charter schools, non-public schools, and residential facilities.[8]

24.     For purposes of the compensatory education provisions of this Consent Decree, the term "services" includes: (a) assistive technology devices, 20 U.S.C. § 1401(1); (b) assistive technology services, 20 U.S.C. § 1401(2); (c) equipment, 20 U.S.C. § 1401(7); (d) related services, 20 U.S.C. § 1401(26); (e) supplementary aids and services, 20 U.S.C. § 1401(33); (f) educational instruction; (g) extension of IDEA eligibility beyond age 21; and (h) any services, devices, products, and/or equipment that can help a student participate in further education, participate in the general education curriculum, obtain employment, and/or live independently.

25.     The term "Student Hearing Office" ("SHO") refers to the Student Hearing Office

_____

[8] This definition may change pursuant to paragraphs 151-153 below.

Section III. (cont'd)

within the State Enforcement and Investigation Division for Special Education under the control

of DCPS.

26.     The term "Superintendent" refers to the Superintendent of the District of

Columbia Public Schools.

## IV.     Settlement Provisions

27.     Defendants will, as quickly as possible, comply with federal law requirements for

timely hearings and timely implementation of HODs and SAs. Notwithstanding the preceding,

this Consent Decree does not require Defendants to meet a compliance level higher than the 90%

level specified in paragraph 29(a) and paragraph 42(d)(ii) below.

## A.     Defendants Will Timely Issue HODs and SAs

28.     The Defendants shall maintain sufficient staff and contracts with independent

Hearing Officers and take additional measures necessary to maintain compliance with the

requirement of paragraphs 29 & 30 below.

29.     Within 30 days of Final Approval of the Consent Decree, the Defendants shall

ensure that:

        a.     Ninety percent (90%) of the requests for hearings are timely adjudicated

(by the issuance of a final HOD) or settled.

        b.     No due process hearing requests are more than 90 days overdue.

30.   The Defendants must achieve at a 100 percent compliance level the obligations

set forth in the preceding paragraph. Defendants hereby waive any right they may otherwise

have to argue that they are in "substantial compliance" with the obligation set forth in the

preceding paragraph if they are close to meeting the obligations but have not absolutely met

them.

Section IV.A. (cont'd)

31.     In the following instances, overdue HODs will not be counted against Defendants in determining whether Defendants are in compliance:

a.     Cases continued due to the parent's or the parent's legal representative's failure to attend a scheduled Resolution Session ("RS") or to respond to the Defendants' efforts to schedule a hearing: If the Defendants have made diligent efforts to contact a parent or parent representative to schedule a RS or due process hearing and are unable to contact that parent or parent representative, the number of days the hearing is delayed will not be counted for the purpose of determining whether the Defendants are in compliance.

b.     Inability to proceed with a properly scheduled hearing: If a Hearing Officer grants a continuance because a parent or parent representative is not prepared to proceed with a properly scheduled hearing, the number of days the hearing is delayed will not be counted for the purpose of determining whether the Defendants are in compliance.

c.     Voluntary withdrawal of a hearing request: If a parent or parent representative voluntarily withdraws a due process complaint, that complaint will be considered resolved and no longer counted as an outstanding request when determining whether the Defendants are in compliance.

d.     Valid continuances: If an HOD is not timely issued due to continuation by the Hearing Officer for good cause, the HOD will not be counted for the purpose of determining whether the Defendants are in compliance, provided that the exclusion from the calculation shall be only for the period of the continuance.

32.     Cases that are continued for any of the following reasons will be counted as untimely and will count against Defendants in compliance calculations:

Section IV.A. (cont'd)

   a.  unavailability of DCPS witnesses or counsel, unless DCPS has made a diligent effort[9] to have such persons appear;

   b.  Hearing Officer unavailability, unless SHO has made a diligent effort to have such persons appear;

   c.  the SHO's or Hearing Officer's decision to allot a different amount of time from that requested by the parent;

   d.  SHO failure to secure adequate physical space for the hearing, unless SHO made a diligent effort to schedule reasonable space under the circumstances known to them at the time of scheduling;

   e.  SHO failure to transmit in a timely manner those notices and documents which it is responsible for distributing;

   f.  late arrival of the Hearing Officer or DCPS attorney to the scheduled hearing; or

   g.  SHO failure to provide the necessary recording equipment to adequately capture the entire proceeding.

---

[9] In paragraph 32, "diligent effort," unless otherwise defined, means that the Defendants shall make timely efforts to secure witnesses, schedule hearing rooms, and assign attorneys to avoid delays in holding hearings and issuing HODs and entering into SAs. The Monitor will regularly examine the Defendants' practices to verify that diligent effort is made.

**B.      Resolution Sessions**

33.      The RS for a parent's administrative due process complaint notice (hereinafter "due process complaint") shall be governed by 20 U.S.C. §1415 and its implementing regulations. Insofar as District rules, regulations, policies and procedures are consistent with federal law and this Consent Decree, they will also govern RSs. The Defendants shall conduct the RS in a way that is consistent with the objectives of IDEA '04. The Defendants shall use good faith efforts to reach a mutually acceptable settlement, consistent with the IDEA and its implementing regulations. The RS is not to be used simply as a means to delay a due process hearing.

34.      The Defendants will exercise due diligence in scheduling RSs. When the parent is represented by counsel, Defendants will make good faith efforts to contact the parent's counsel to arrange a RS at a time when the parent and the parent's counsel can attend, if the parent's counsel plans to attend. Nothing in this paragraph shall exempt a parent from being required to attend and participate in a RS. Defendants have exercised due diligence when the following steps are taken:

a.      Within three days of a parent filing a due process complaint, the Defendants telephone the office of the parent counsel to schedule the RS, unless the parent counsel agrees to allow the Defendants to contact the parent directly. If the parent counsel is not available upon initiation of the phone contact, a message shall be left for the counsel with respect to the Defendants' attempt to schedule a RS, identifying the individual (with phone contact information) to whom the counsel should respond. If a parent is not represented, the Defendants will attempt to make telephone contact directly with the parent within three days of the parent

Section IV.B. (cont'd)

filing a due process complaint and in the event the parent is unavailable, shall leave a message, if

feasible, with respect to the school's attempt to schedule a RS, identifying the individual (with

phone contact information) to whom the parent should respond. Defendants failure to initiate

contact within the first three days does not absolve a parent from participating in an RS when the

RS is scheduled within the statutory 15 days and the parent and parent counsel (if Defendants

have been notified of the parent's representation) have received at least 4 full calendar days prior

notice of the scheduled RS meeting.

      b.     If, within 48 hours of receiving the initial scheduling call referenced in (a)

above, the parent counsel or the parent fails to return the Defendants' telephone call(s) or to

otherwise make contact with the Defendants to schedule a RS, the Defendants shall send by

facsimile a "confirmation of meeting notice" to the parent counsel with a copy to the parents (by

regular mail). The "confirmation of meeting notice" shall include a date, selected by the

Defendants, within the statutory fifteen (15) days, on which the RS will be held. In the event that

Defendants must unilaterally schedule a RS through use of a "confirmation of meeting notice"

letter, it shall select a RS date that falls at least 4 calendar days after the date that the parent

counsel and the parent can reasonably be anticipated to have received "the confirmation of

meeting notice." For purposes of scheduling calculations, a confirmation notice shall be

presumed to be received 3 days subsequent to its posting in United States mail.

      c.     Where there has been a mutual waiver of the RS, the parties to the

individual complaint will jointly contact the SHO which shall arrange a "specially set" due

Section IV.B. (cont'd)

process hearing.[10] The HO shall issue an HOD within 10 days of the hearing or 75 days of the complaint, whichever is earlier.

35.     If Defendants fail to make any attempt to schedule a RS within the statutory fifteen (15) days, Defendants shall not be granted a continuance of the due process hearing except under exceptional circumstances. Failure to notice and conduct a RS shall not constitute an exceptional circumstance.

36.     Any alleged procedural failures that occur during the RS process may be presented to the HO at the due process hearing and considered by the HO, consistent with 20 U.S.C. §1415(f)(3)(E), 34 CFR § 500.513.

37.     Parent representatives can participate in RSs as counsel/advocates for the parents. No adverse consequences shall flow from the parent's decision to have a representative accompany them to RS. RSs shall not be delayed for the failure of a parent representative to attend a scheduled RS where Defendants have followed the scheduling and notice procedures contained herein and attempted in good faith to accommodate the representative's schedule within the 15-day meeting window.

38.     The Due Process Complaint Disposition Form is to be completed at the conclusion of the RS and a copy shall be immediately provided to the parent and parent's representative and forwarded within 72 hours to the Office of the General Counsel for DCPS ("OGC"). The Due Process Complaint Disposition Form may not represent that the parties to the individual complaint have reached resolution until such parties have a signed agreement that

---

[10] A "specially set" due process hearing will be an expedited hearing, to be set on the next available date upon notice from the parties.

Section IV.B. (cont'd)

conforms to IDEA '04. If the RS was unsuccessful, the OGC is obligated to forward the form to the SHO as soon as the OGC determines that further settlement discussions would not be productive.

39.     The Monitor will assess the RS process to determine if there are any systemic problems regarding scheduling or other implementation issues. The Monitor will issue a report of findings and recommendations by January 31, 2007. Thereafter, the Monitor will report on the RS process at the Monitor's discretion and may, at his/her discretion, include subsequent findings and recommendations in the Monitor's annual report to the Court.

## C.     Defendants will Timely Implement HODS and SAs

40.     The Defendants shall hire and maintain sufficient staff and take other needed measures to meet their obligations under paragraphs 41-43 below.

41.     By June 30, 2007, the Defendants shall eliminate the Jones initial backlog by implementing and/or closing all of the initial backlog cases.

42.     Defendants shall manage the Jones subsequent backlog as follows:

a.     By June 30, 2007, (i) no case in the subsequent backlog will be more than 180 days overdue and (ii) 50% of the HODs/SAs issued on or after March 1, 2006, will be timely implemented (i.e., not "overdue").

b.     By June 30, 2008, (i) no case in the subsequent backlog will be more than 150 days overdue and (ii) 65% of the HODs/SAs issued on or after July 1, 2007 will be timely implemented (i.e., not "overdue").

c.     By June 30, 2009, (i) no case in the subsequent backlog will be  more than 120 days overdue and (ii) 80 % of the HODs/SAs, issued on or after July 1, 2008 will be timely implemented (i.e. not "overdue").

Section IV.C. (cont'd)

d.      By June 30, 2010, (i) no case in the subsequent backlog will be more than
90 days overdue and (ii) 90% of the HODs/SAs issued on or after July 1, 2009 will be
timely implemented (i.e., not "overdue"). Thereafter, Defendants will maintain this
level of performance.

43.     The Defendants shall achieve a 100 percent compliance level with the obligations
set forth in paragraphs 41 & 42 above. Defendants hereby waive any right they may otherwise
have to argue that they are in "substantial compliance" with the obligations set forth in
paragraphs 41 & 42  above if they are close to meeting the obligations but have not absolutely
met them.

44.     By the beginning of the 2006-2007 school year, Defendants will adopt a protocol
for closing HODs and SAs. By August 31, 2006, the parties will agree on the content of the
protocol.  If the parties cannot agree by that date, they will present the matter to the Monitor,
who, by September 15, 2006, will decide the content of the protocol.

45.     When a case in the Jones subsequent backlog has been overdue longer than the
time frames permitted in this Consent Decree (i.e., 180, 150, 120, 90 days), Defendants may
present written information to the Monitor and to plaintiffs' counsel to establish that there are
exceptional circumstances that warrant an exemption.  The Monitor, at his/her discretion, may
grant an exemption to the specified timeframes upon a showing of exceptional circumstances.

46.     Within 10 business days of the end of each quarter (January-March, April-June,
July-September, October-December), Defendants will report to counsel for the plaintiffs
and the Monitor the status of cases in the Jones initial and subsequent backlog, including
the rate of timely implementation, the number of cases overdue, and information about
the length of time cases have been overdue. Defendants will make their first quarterly

Section IV.C. (cont'd)

report by October 13, 2006. The rate of timely implementation will be determined as

follows: (a) the number of HODs and SAs issued during the measurement period that

have been timely implemented will be divided by (b) the total number of HODs and SAs

issued during the same measurement period, minus (c) the number of HODs and SAs issued

during the same measurement period that are "outstanding" and not overdue.

$$\frac{(a)}{(b) - (c)} = \% \text{ Timely Implemented}$$

47.     Defendants plan to execute the actions set forth in the Action Plan to fulfill their

commitment to (1) eliminate the Jones initial backlog and (2) manage any Jones subsequent

backlog. The Action Plan is not enforceable, except as specified elsewhere in this Consent

Decree.

48.     In eliminating both the Jones initial backlog and the Jones subsequent backlog,

the Defendants will use their best efforts to prioritize resolution of the oldest overdue

HODs/SAs.

49.     The obligations set forth in paragraphs 41 & 42 will be reassessed after the first

report of the Evaluation Team (see paragraphs 101-110) and thereafter annually, after issuance of

the Evaluation Team's annual report. Upward adjustments may include: (i) shortening the time

for meeting particular obligations, (ii) increasing the percentage of cases that will be timely

implemented by a certain date, and/or (iii) decreasing the amount of days that cases may be

overdue. However, no upward adjustments may be made to the percentage of cases specified in

subparagraph 42(d)(ii) (90% of HODs/SA's timely implemented).

Section IV.C. (cont'd)

       a.      If, based on the Team's report, Plaintiffs believe upward adjustments to the obligations in paragraph 41 and/or 42 are appropriate, they shall submit a letter to Defendants with their proposed adjustments and the reasoning underlying their proposal no later than 21 days after the issuance of Evaluation Team's report.

       b.      If, upon receiving Plaintiffs' proposal for upward adjustments, Defendants disagree that any upward adjustment is appropriate, they may decline to engage in negotiations and may ask the Monitor to decide, after receiving presentations from both Plaintiffs and Defendants, whether upward adjustments are appropriate and, if so, the nature and amount of such adjustments.

       c.      If Defendants agree that an upward adjustment is appropriate, the parties will try to negotiate an agreement on the nature and amount of the upward adjustments. Either party may seek the assistance of the Monitor or another agreed-upon expert in their negotiations. Additionally, either party may seek the assistance of the ADR Specialist using the ADR process described in this Consent Decree (but shortened to fit within the 45 day time frame below). If, after 45 days from the date Defendants' receive Plaintiffs' proposal, the parties cannot agree on whether there should be upward adjustments or the amount of such adjustments, they shall make a presentation to the Monitor, who shall decide the appropriate amount of such adjustments.

       d.      Any upward adjustments agreed to by the parties or recommended by the Monitor will be submitted to the Court for review and approval.

       e.      Should the obligations be adjusted upwards pursuant to this paragraph, Defendants shall achieve a 100 percent level with the adjusted obligations. Defendants hereby waive any right they may otherwise have to argue that they are in "substantial compliance" with the adjusted obligations  if they are close to meeting the obligations but have

Section IV.C. (cont'd)

not absolutely met them.

50.     Until the Jones portion of the case is terminated, the District government will provide the sum of $5 million annually to implement the actions described in Section IV.C. paragraphs 40-52, which are required to address performance issues arising in prior years. The contribution of these funds is not intended to define a limit on expenditures necessary to come into compliance with the requirements in Section IV.C. of this Consent Decree and shall not supplant other DCPS funds.

51.     Defendants must comply with the Action Plan's specification that an additional seventy (70) full time equivalent positions ("FTEs") will be created and filled. However, DCPS has discretion to move and switch positions, provided that (1) the total number of FTEs is retained, and (2) before making staffing changes, DCPS consults with the Monitor and the Monitor does not object within fifteen (15) days of such consultation. Additionally, if changed circumstances warrant, DCPS may reallocate the funds from FTEs to other uses, provided that (1) the reallocation is consistent with the provisions and intent of this Decree, and (2) before reallocating, DCPS consults with the Monitor and the Monitor does not object to the reallocation within (15) days of such consultation. If the Monitor objects, DCPS may ask the Court to approve the reallocation. DCPS will notify plaintiffs' counsel at the time it consults with the Monitor about moving and switching positions or reallocating the funds from FTEs to other uses.

52.     When implementation of HOD or SA provisions requires Defendants to contact the parent or parent representative, the affected provisions of the HOD or SA will be considered "outstanding" but not "overdue" if the Defendants have made diligent efforts to contact a parent or parent representative. "Diligent efforts" in this context means that Defendants shall, at a minimum, for HODs and SAs that expressly require Defendants to make contact through a

Section IV.C. (cont'd)

parent representative: (1) attempt contact with the parent representative by facsimile, telephone, or e-mail, and (2) if no contact is made (by phone, in person or by leaving a message; by facsimile, no confirmation is produced; by e-mail, delivery is confirmed), attempt contact by First Class mail with proof of delivery to the last address filed by the parent representative.  For cases in which the HOD or SA does not explicitly require contact through a parent representative, Defendants shall at a minimum (1) attempt contact with the parent by First Class mail with proof of delivery at the most recent address provided to Defendants by the parent, and (2) if delivery cannot be confirmed, Defendants will make at least two attempts to contact the parent by phone, including at least one call outside of work hours.

## D.    Student Hearing Office

53.    *Continuation of the Student Hearing Office*: The Office of Administrative Hearings Independence Preservation Act of 2004, effective on September 8, 2004, does not mandate the transfer of responsibility for special education hearings from the State Enforcement and Investigation Division to OAH.  The State Enforcement and Investigation Division will maintain jurisdiction for holding special education hearings at least during the pendency of the Blackman portion of the case.  Defendant-Intervenor OAH will not seek or support a transfer to OAH of responsibility for special education hearings during the pendency of the Blackman portion of this case.

54.    *SHO Standard Operating Procedures Manual*: The SHO Standard Operating Procedures Manual became effective on February 8, 2006.[11] The Defendants have posted a

---

[11] A revised SHO Standard Operating Procedures Manual will be filed on or before July 7, 2006.  (Exhibit C).

Section IV.D. (cont'd)

searchable copy of the revised SHO Standard Operating Procedures manual on DCPS' website.

Defendants have e-mailed (or mailed if no e-mail address was available) a notice – that new

SHO Standard Operating Procedures have been issued with a link to the url on DCPS' website –

to all parent representatives who, within the last 12 months, have requested a due process hearing

or filed a complaint. The SHO will provide parents, upon request, a paper copy of the SOP. Once

it is in existence, the Parent Service Center will provide a paper copy of the SOP to parents upon

request. Defendants shall make copies available at Advocates for Justice in

Education, the District's Parent Information and Training Center. During the pendency of this

Consent Decree, Defendants shall ensure that any changes to the manual are promptly and

obviously noted on the website and that notices of any changes are distributed via email,

facsimile, or regular mail to SHO staff, Hearing Officers, Advocates for Justice in Education,

parent representatives who have requested a hearing within the preceding 12 months of the

change, and anyone else who requests them.

      a.      Defendants may make changes to the Standard Operating Procedures

Manual only after giving notice to class counsel. If class counsel do not agree with the

change(s), they shall have 15 days in which to object and bring the dispute to the Monitor, who

will recommend a resolution of the issue consistent with the purposes of this Consent Decree. In

the absence of such objection by class counsel, the changes shall become effective. If either

party is dissatisfied by the Monitor's proposed resolution of the issue, they may seek the

assistance of the ADR Specialist using the process described in this Consent Decree.

      b.      In addition, the Defendants agree that prior to publishing proposed

procedural rules for the scheduling of special education due process hearings that would conflict

with the Standard Operating Procedures Manual, the SHO will give notice to and consult with

Section IV.D. (cont'd)

class counsel. If class counsel do not agree with the proposed rules, they shall have 15 days in

which to object and bring the dispute to the Monitor, who will recommend a resolution of the

issue consistent with the purposes of this Consent Decree.  In the absence of such objection by

class counsel, the Defendants will be free to publish the proposed rules. If either party is

dissatisfied by the Monitor's recommended resolution of the issue, they may seek the assistance

of the ADR Specialist using the ADR process described in this Consent Decree. If, as a result of

the process in this subparagraph, procedural rules for the scheduling of special education due

process hearings that would conflict with the Standard Operating Procedures Manual are

adopted, the Standard Operating Procedures Manual will be changed to conform to the rules so

adopted.

55.     SHO Operating Principles: Defendants shall ensure that SHO holds hearings in a

timely and professional manner.  SHO shall maintain sufficient staff, equipment, and other

resources to accomplish this. In addition, SHO shall implement appropriate training,

supervision, and other practices, including:

a.      Training of Hearing Officers: Defendants will ensure that all

Hearing Officers receive initial training within 45 days of their appointment. After their initial

training, all Hearing Officers will receive ongoing training on at least an annual basis. Any

training the Hearing Officers receive shall be fair and balanced, designed to enhance their

understanding of the relevant law and of how children with disabilities should be served in

educational settings. Such training should be sensitive to the interests of all the parties, and

should be sufficient to enable the Hearing Officer to make informed, impartial, and timely

decisions. The Defendants shall ensure that the Hearing Officers have access to the most recent

relevant case law, including access to the Individuals with Disabilities Education Law Reporter

Section IV.D. (cont'd)

(IDELR). The Defendants shall ensure that class counsel and/or their designees have the opportunity to provide input regarding all Hearing Officer training and all training materials distributed to Hearing Officers. For Plaintiffs to provide meaningful input, Defendants shall ensure that class counsel and/or their designees have an opportunity to review training materials and observe training sessions, notice of which shall be provided no less than 30 days prior thereto.  Defendants or their representatives shall have the same opportunities as Plaintiffs to review the training materials and observe the training sessions. The designee of class counsel and Defendants, if any, shall not be an attorney or other person who has a matter pending before any Hearing Officer.

      b.      Scheduling: The time originally allotted for the hearing shall be decided by the SHO in accordance with the SHO Standard Operating Procedures Manual. Only Hearing Officers may deny or modify a party's request to alter the time allotted for a hearing and only after allowing the requesting party an opportunity to be heard about the reason for the request and allowing the opposing party an opportunity to respond. Only Hearing Officers may grant continuances of hearings that have already been set, and such requests must be made in accordance with the procedures in the SHO Standard Operating Procedures Manual. To comply with this provision, Hearing Officers must issue written determinations when continuances are granted or denied, and the written determination must state the basis for granting or denying the continuance, including whether good cause was found. No more than one continuance per side shall be granted in any case unless the Chief Hearing Officer grants another continuance based on exceptional circumstances. Continuances shall be limited to ten (10) days unless the Chief Hearing Officer orders otherwise after review.

Section IV.D. (cont'd)

       c.      Communication: SHO staff shall promptly and professionally perform their duties, including responding to inquiries.  In the exceptional situations in which the telephone cannot be answered promptly and after normal business hours, there will be in place a mechanism to record all messages. All messages will be retrieved promptly and calls returned no later than the close of the next business day unless exceptional circumstances prevent it.

       d.      Office Administration: The SHO will provide and coordinate timely logistical support for all hearings, including, *inter alia*, the following:

       i.      The prompt distribution of documents and notices for which the SHO is responsible, the timely and accurate recording of all hearings, and the timely provision of hearing transcripts and audiotapes upon request;

       ii.      Accurate and timely documentation of all incoming and outgoing correspondence, including faxes and oral communications;

       iii.      Maintenance of historical statistical data

       iv.      Archival of hearing files in such a manner that they are complete and easily retrieved; and

       v.      Sufficient office and working space for the staff at all times and for the use of Hearing Officers in the period before, after, and between hearings. The SHO will ensure that there is adequate space  for hearings, including for the entire time requested by the parties to the individual complaint or allotted by a Hearing Officer.

       e.      Neutrality: The staff of the SHO will maintain neutrality and will hold at arm's length both parties to an individual complaint. Hearing Officers shall not engage in impermissible *ex parte* communications with parties to an individual complaint, counsel for parties, witnesses, or anyone else involved in hearings over which they are presiding.

**E.      The Office of Administrative Hearings**

56.      During the pendency of the Blackman portion of this case, Defendants may not agree to transfer special education jurisdiction from the State Enforcement and Investigation Division to OAH pursuant to Section 6(c) of the OAH Establishment Act of 2001 or under discretionary authority. In addition, OAH will not seek or support such transfer during the pendency of the Blackman portion of this case.

57.      Notwithstanding any other provision of this Consent Decree (including later modifications), Plaintiffs and Defendants acknowledge that OAH is bound only by terms and requirements of Sections III, IV.D (paragraph 53) and IV.E of this Consent Decree.

58.      If, absent OAH's consent, Sections III, IV.D (paragraph 53), and/or IV.E are modified, amended, or deleted, or are through any other action rendered other than fully operative, this Decree shall automatically terminate as between OAH and the parties, but not as between Plaintiffs and Defendants. If such termination occurs, the parties shall participate in non-binding confidential mediation in a good faith attempt to resolve the issue that triggered termination, upon OAH's or any party's request or upon order of the Court.

59.      In the event the Blackman portion of the case is terminated pursuant to Section X.A,  the parties and OAH shall have the same rights, claims, and defenses that they had prior to the signing of this Consent Decree.

**F.    Defendants Will Maintain an Accurate Data System.**

60.      The defendants will achieve and maintain an accurate and reliable data system that will allow DCPS to track implementation of HODs/SAs, and to identify impediments to

Section IV.F. (cont'd)

timely implementation of HODs/SAs.  DCPS will retain an expert in systems analysis to assist

and consult with DCPS in achieving and maintaining such a system.[12]

61.     DCPS currently uses ENCORE as its special education case management system

and will maintain the use of ENCORE or a comparable data tracking system.[13] DCPS

implemented the Special Education Tracking System (SETS) Project in 2000 as the result of the

Blackman/Jones case. In August 2005, DCPS underwent a migration from SETS to ENCORE.

62.     The defendants will conduct an accuracy audit of ENCORE, of a representative

sample of files, by September 30, 2006, to establish a baseline for accuracy of the system.

Thereafter, accuracy audits will be conducted at least annually. The purpose of the audits is to

verify that the special education documentation contained within the special education student's

folder (IEP, Assessments, Meeting Notes, etc.) is in compliance with federal regulations and

DCPS policies and procedures and that the data contained in ENCORE is congruent with the

student's paper record.

63.     The defendants had achieved a 96% accuracy rate with SETS and will obtain a

96% accuracy rate by September 1, 2007, for ENCORE for special education students in DCPS

public programs, residential schools, and private schools. The accuracy rate will be measured by

audit of a representative sample of student files.

64.     The baseline and subsequent audits shall compare the paper or electronic student

---

[12] DCPS has retained Dr. Rebecca J. Klemm for this purpose. (C.V. attached as Exhibit D).

[13] ENCORE, the successor to and an enhanced version of SETS, is a web-enabled application that serves as the system of record for managing and monitoring special education student data. All aspects of special education data management, from referral to initiation of delivery of services, are tracked to ensure compliance with legal requirements. ENCORE will also interface with DC STARS, DCPS' student information system, sharing data that each has authority over, negating the need for duplicate data entry and ensuring congruity between the databases.

Section IV.F. (cont'd)

file to the computer data record where applicable, reviewing the accuracy rate on an individual

variable and aggregate basis for the following variables:

      a.      Student name

      b.      Student address and telephone number

      c.      Date of birth

      d.      Individualized Education Program (IEP) and implementation date

      e.      Least Restrictive Environment (LRE) code.

      f.      Related services and duration (including date initiated, how often

initiated, and how administered—i.e., group versus individual)

      g.      Related services providers

      h.      Related services time unit

      i.      Attending school number

      j.      Social security number or student identification number

      k.      Date and type of last evaluation or re-evaluation

      l.      Date of complaint or hearing request

      m.      Date of hearing or settlement, including dates of continuances

      n.      Date HOD issued

      o.      Details of DCPS obligations under HOD or SA

      p.      Date and description of DCPS completion of each obligation under

HOD or SA.

      65.      To ensure that related service delivery functions as required by law, the

defendants shall establish an effective process to identify related service lapses as soon as

possible and to resolve service lapses and individual complaints in an expeditious manner. The

Section IV.F. (cont'd)

Encounter Tracker (ET) portion of the ENCORE database will be utilized for this purpose. ET tracks, inter alia, hours of lapses in related services, types of related services missed, reason for related services not being delivered, date of DCPS action to address related service lapse, and description of DCPS action to address related service lapse.

      a.      Beginning with the school year 2005-06, all DCPS schools, except charter schools, were required to use the electronic version of ET for tracking the provision of all related services. All schools will have the ability to generate, and will generate, the necessary reports to track the actual delivery of related services to special education students. These ET management reports will provide the defendants with the information required to conduct gap and trend analysis to take action as determined appropriate. DCPS will provide appropriate training to related service providers for the electronic version of ET.

      b.      DCPS will monitor and analyze the data from the ET system, to obtain an early warning on related service lapses and to determine individual staff performance and accountability. Principals and appropriate staff will be required to act on related service management reports by reviewing the data on the provision of related services and communicating with appropriate Central Administration personnel to obtain any additional resources needed to ensure full implementation of related services prescribed by IEPs. Central Administration will monitor principals and appropriate staff to ensure that they are using the ET management reports in this fashion.

      c.      If ENCORE management reports reveal information about staff performance and/or accountability, the action taken by DCPS may consist of deploying additional resources where related services are not being delivered, invoking disciplinary action and/or providing training for providers who fail to meet the standard of full implementation of

Section IV.F. (cont'd)

IEP related services. Nothing in this section prevents a parent from seeking relief under the due

process provisions of IDEA for related service lapses.

66.     The defendants shall make ET reports and other related services data

available to the Monitor and class counsel. The Monitor will verify the accuracy of the data and

evaluate how the data is being used.  In his/her discretion, the Monitor may rely on the

Evaluation team in meeting this responsibility.

**G.     Defendants Will Maintain a Parent Service Center**

67.     The District of Columbia Public Schools will maintain a community-based parent

service center for parents of special education students. The center will be managed by a private

vendor, a non-profit organization, or a selected office within the DC Public Schools with a

special education parent representative included on the staff. The purpose of the parent service

center is to improve the school system's effectiveness in responding to concerns raised by parents

of students with disabilities and to assist in prompt resolution of disputes before a formal

complaint is filed.

68.     The center will have the following features: (a) trained representatives available

for at least 50 hours per week to speak with parents of special education students in the

languages required by DCPS; (b) within (15) days of initial contact, representatives will follow

up by calling or meeting with parents, as well as DCPS employees, with the goal of resolving

issues raised; (c) widespread distribution of marketing, promotion, and outreach materials

developed and implemented in collaboration with the DC Parent Training and Information

Center, currently managed by Advocates for Justice in Education, Inc., to announce the

availability, resources, and purpose of the service center, such outreach efforts to include written

and oral (e.g., radio, television, presentations) presentation of the information and annual

Section IV.G. (cont'd)

distribution of written materials to all parents; (d) a semi-annual parent satisfaction survey,

formulated in consultation with class counsel, to assess parent impressions of the effectiveness of

the service center; and (e) coordination of the parent service center with the transportation call

center.

69.     Any substantial change in the features described in paragraph 68 above will be

made only after notice to and consultation with class counsel. If class counsel do not agree with

such change, they shall have 15 days in which to object and bring the dispute to the Monitor,

who will recommend a resolution of the issue consistent with the purposes of this Consent

Decree.   In the absence of any such objection by class counsel, the Defendants will be free to

make the change. If either party is dissatisfied with the Monitor's proposed resolution of the

issue, they may seek the assistance of the ADR Specialist using the ADR process described in

this Consent Decree.

## H.     Defendants Will Revise Principal and Teacher Evaluations and the Parent Evaluation Form.

70.     DCPS revised its principal evaluation forms to increase the emphasis on the

provision of special education services. Implementation of the evaluations began during the

2004-05 school year and will continue.

71.     Defendants will revise the teacher performance evaluation process so that

it adequately evaluates the teacher's compliance with IDEA requirements that are under the

teacher's area of control and responsibility.

72.     DCPS will revise the annual parent evaluation form (which can be conducted

based on a random sample) so that it includes a section specific to special education parents.

Section IV.H. (cont'd)

a.      The section will be developed or revised with input from class counsel and after consultation with the Monitor or another agreed upon expert. Items in that section will include, but not be limited to, items that measure principal and teacher responsiveness to parents of special education students, the timely implementation of HODs and SAs, the timely provision of services, the timely completion of evaluations, the timely provision of related services, and whether students are receiving satisfactory outcomes. DCPS will distribute the parent evaluation form at least annually and provide a timely compilation of responses on the special education section to class counsel.

b.      If the annual parent evaluation form does not produce representative results for each disability category and for each age group, defendants will utilize alternative means of gathering parent feedback, such as focus groups and one-on-one telephone or personal interviews, in order to get such results.

73.      Any changes to the process described in paragraphs 72 above will be made only after notice to and consultation with class counsel. If class counsel do not agree with any such changes, they shall have (15) days in which to object and bring the dispute to the Monitor, who will recommend a resolution of the issue consistent with the purposes of this Consent Decree.  In the absence of any such objection by class counsel, the Defendants will be free to make the changes. If either party is dissatisfied with the Monitor's recommended resolution of the issue, they may seek the assistance of the ADR Specialist using the ADR process described in this Consent Decree.

## I.      Compensatory Education for Class Members

74.      Compensatory Education is an important mechanism for addressing the loss of services caused by the denial of timely hearings and the failure to receive timely implementation

Section IV.I. (cont'd)

of HODs and SAs. This Consent Decree establishes a rebuttable presumption of harm for students denied timely hearings or HOD and for students who failed to receive timely implementation of HODs and SAs. Within (15) days of Final Approval of this Consent Decree, Defendants will revise their policies and the due process complaint request form to incorporate this rebuttable presumption of harm.

75.     Class members must follow the procedures in paragraph 76 below in order to receive compensatory education.[14] The only exception is Blackman subclass members whose hearings have not yet been held; Blackman subclass members must seek compensatory education at a due process hearing. These subclass members may raise the issue of compensatory education at due process hearing (or with DCPS during settlement discussions) even if compensatory education was not listed as an issue on the class member's due process hearing request. Defendants will advise Hearing Officers that, in the event that a class member does not raise the issue of compensatory education on his/her own, the Hearing Officer should ask the class member if he/she wishes to have compensatory education considered.

76.     Class members may obtain compensatory education under either of the following procedures.

a.      Electing available products and/or services from the Blackman/Jones Compensatory Education Catalog ("Catalog", attached hereto as Exhibit E), or

b.      Addressing compensatory education at an IEP meeting.

---

[14] "Compensatory education" as used in paragraphs 74-82 refers to compensatory education for Blackman/Jones delays only.

Section IV.I. (cont'd)

    i.  Defendants will ensure that all IEP teams are authorized to determine compensatory education awards and that all teams are made aware of and exercise that authority.

    ii.  If the class member is no longer a DC student, and hence no IEP meeting will be held in the future, the issue of compensatory education will be addressed in a meeting with personnel in Central Administration instead of an IEP meeting. The personnel in Central Administration must resolve the request for compensatory education within 60 days of receiving the request and shall deliver the compensatory education within a reasonable period of time, not to exceed 180 days. The Catalog and DCPS' website will clearly identify the personnel responsible for compensatory education matters under this Consent Decree and a phone number for reaching them.

    iii.  If the class member chooses to pursue compensatory education through the process in paragraph 76(b) above, the class member may request a due process hearing if dissatisfied with the resolution of his/her request for compensatory education at the IEP meeting or by the Central Administration personnel. At the due process hearing the Hearing Officer will decide and include his/her decision in the HOD whether the student is entitled to compensatory education (taking into account the rebuttable presumption of harm) and if so, the type and duration of the compensatory education to which the student is entitled. Either party to the due process hearing may seek judicial review or enforcement of an HOD granting or denying compensatory education. Defendants will advise Hearing Officers that they must consider at the hearing whether to award compensatory education and that they must state in the HOD what compensatory education if any will be awarded.

Section IV.I. (cont'd)

77.     Within 60 days of the Court granting Final Approval of this Consent Decree, each

existing class member will be provided a copy of the Catalog and a letter describing the "level"

(A-D) of compensatory education which the student is entitled. Future class members will

receive a Catalog and letter describing the "level" of compensatory education within 60 days of

becoming a class member (as a result of an untimely HOD or untimely implementation of an

HOD/SA). The Catalog will include directions for election from the Catalog.  The letter will

provide the class member at least 180 days from date of receipt to select the products and/or

services and inform DCPS of his/her selection. If within 180 days of receiving the Catalog and

letter, a class member does not inform DCPS of his/her election of products and/or services from

the Catalog and also does not request compensatory education pursuant to paragraph 76(b)

above, the class member will be deemed to have waived his/her right to compensatory education.

Once the parent has notified DCPS of his/her selection from the Catalog, in the absence of

exceptional circumstances DCPS shall begin delivering the selected products and/or services (a)

within a reasonable period of time not to exceed 180 days of receiving the notification or (b) as

otherwise agreed by the class member and DCPS. The parent may seek administrative and/or

judicial enforcement of any compensatory award selected from the Catalog. To ensure timely

delivery of products and services pursuant to federal law and federal court order, Defendants'

procurement of such products and/or services to class members under this Consent Decree may

be made without regard to the DC Procurement Practices Act, D.C. Code § 2-301.01 et seq., any

other District or federal law relating to procurement, and any regulations thereunder.

78.     Because there is a rebuttable presumption of harm for untimely HODs and

untimely implementation of HODs/SAs, there is automatic eligibility for the products and/or

services identified in the Catalog, unless the Defendants succeed in rebutting the presumption. In

Section IV.I. (cont'd)

order to rebut the presumption, DCPS must request a hearing within 60 days after the class

member makes a selection from the Catalog.  At the hearing, DCPS will have the burden of

proving one of the following situations: (1) DCPS has already provided or agreed to provide

compensatory education to the class member for Blackman/Jones delays; (2) the issue of

compensatory education has already been determined by a Hearing Officer and the Hearing

Officer has either ordered compensatory education or has determined that the child is not entitled

to compensatory education for Blackman/Jones delays; (3) the class member has been found

ineligible for special education services;[15] (4) the student graduated with a regular diploma; (5)

the student no longer is a resident of the District of Columbia; (6) the student graduated with a

certificate of IEP completion; (7) the student has been in general education on a full-time basis

for at least one academic year because the student met his/her IEP goals; (8) the student has been

in a non-public general education school for at least three consecutive grading periods or (27)

weeks, whichever is greater; or (9) the sole unimplemented HOD or SA provision pertained to

reimbursement for services the parent obtained privately. If the Defendants introduce evidence at

a hearing to rebut the presumption, the student shall have the opportunity, at the same hearing, to

present evidence to show that he/she has been harmed. In such case the Defendants may then

present evidence, at the same hearing, to defend against the claim of harm.

79.     The Defendants shall make diligent efforts to identify all members of the

Blackman/Jones class who are entitled to receive the Catalog. "Diligent efforts" in this context

---

[15] This provision applies to (a) class members who are found ineligible at an overdue hearing and (b) class members who are found ineligible as a result of an ineligibility finding by an MDT team that was not later overruled by a hearing officer.  It does not apply to class members who were found eligible and then were later transitioned out of special education due to educational progress.

Section IV.I. (cont'd)

shall mean, at a minimum, reviewing the monthly and quarterly reports that have been submitted

by DCPS to class counsel during the pendency of this litigation and utilizing the lists of class

members developed when the initial Settlement Agreement was executed in June 1999.  Once

identified, the Defendants shall make diligent efforts to provide them a copy of the Catalog.

"Diligent efforts" in this context means that DCPS shall, at a minimum, (1) send the Catalog via

First Class mail with proof of delivery to the most recent address provided to DCPS by the

parent, and (2) if delivery cannot be confirmed, DCPS will make at least two attempts to contact

the parent by phone, including at least one call outside of work hours, unless DCPS has been

informed that the class member is currently represented by a parent representative for purposes

of Blackman/Jones compensatory education. In addition, DCPS will send a letter to each parent

representative who had requested a due process hearing on behalf of a class member. The letter

will list every class member on whose behalf the parent representative had requested a due

process hearing. The parent representative will be asked to indicate those class members he/she

will be representing for purposes of determining compensatory education awards for the class

member. A parent representative who does not respond within 30 days to DCPS' request will be

deemed to represent none of the class members listed in the letter for purposes of determining

compensatory education awards.

80.     Eligibility for compensatory education awards will be calculated in the following

manner: a total of

a.      The number of days between (i) the date when an HOD was due and (ii)

the date when the HOD was issued or a SA was entered into or, if there is not yet a HOD or SA,

the date of the calculation.

Section IV.I. (cont'd)

b.      The number of days between (i) the date when the longest unimplemented provision of an HOD or SA was required to be implemented and (ii) the date when it was implemented or, if there is still an unimplemented provision, the date of the calculation.

The following "levels" of compensatory education will be used, based on the total number of days included in (a) and (b) above, as adjusted per (c) below:

A.      1-60 days

B.      61-180 days

C.      181-365 days

D.      366 or more days.

These "levels" (A-D) will correspond to products and/or services offered in the Catalog. Eligible class members may select a product and/or service that corresponds to their level or a lower level.

c.      If, on the date of the calculation:

i.      The class member is entitled to compensatory education at level A only, and

ii.     Any of the provisions of the class member's HOD or SA remain overdue, then the class member's compensatory education award will be increased to level B. In other words, if the award level would be A based on (a) and (b) above, but a provision of the HOD or SA is unimplemented, the class member will be entitled to compensatory education at level B.

81.     The foregoing section on compensatory education and the ability to select services from the Catalog is limited to members of the Blackman/Jones class covered by this Consent Decree. The provisions in this section shall not have precedential effect in any other

Section IV.I. (cont'd)

proceeding pursuant to IDEA, including those concerning compensatory education, unless by

agreement of the parties in any such proceeding.

82.     The District government will provide the sum of $10 million to fulfill the

obligations in Section IV.I, which is necessary to address prior year performance issues. The

contribution of these funds is not intended to define a limit on expenditures necessary to come

into compliance with the requirements in Section IV.I. of this Consent Decree and shall not

supplant other DCPS funds.

## V.     Consent Decree Oversight and Enforcement

**A.     A Monitor will be Appointed to Monitor and Report on the Implementation of this Consent Decree.**

83.     The parties agree to the appointment of, and will ask the Court to appoint, a

Monitor who will report to the Court, class counsel, and Defendants on Defendants' compliance

with the provisions of this Consent Decree, including any and all binding agreements of the

parties, binding decisions of the ADR Specialist, amendments to the Decree, and subsequent

orders of the  Court (hereinafter referred to as "this Consent Decree and other binding

obligations"). The Monitor will alert the Defendants and class counsel as soon as it becomes

apparent that the Defendants are unlikely to meet any of the provisions of the Consent Decree

and other binding obligations.

84.     Amy Totenberg has agreed to serve as the Monitor. Ms. Totenberg's curriculum

vitae is attached as Exhibit F.

85.     If, after the Monitor appointed, the Monitor is incapacitated, resigns, or is

otherwise unable to perform his/her duties in whole or in part, the parties will agree upon a new

Section V.A. (cont'd)

Monitor. If the parties cannot agree, they will ask the Court to decide the matter after receiving

recommendations from Plaintiffs and Defendants.

86.      In addition to the other specific responsibilities set forth elsewhere in

the Consent Decree,[16] the Monitor will:

      a.      keep the parties apprised of the Defendants' progress and the

status of compliance;

      b.      upon request of either party, meet with the parties to discuss

progress and further measures needed to achieve compliance;

      c.      upon request of either party, facilitate resolution of disputes

that arise under this Consent Decree;

      d.      review documents and information provided by Defendants or

class counsel and timely respond to written inquiries from the parties;

      e.      prepare a compliance report to be submitted to the parties

and to the Court on an annual basis, or more frequently at the Monitor's discretion or as

the Court orders;

      f.      serve as a member of the Evaluation Team, and

      g.      perform such other duties as are assigned by the Court

87.      The Monitor may hire consultants or staff, including experts and administrative

assistants, subject to the limitations in paragraphs 94, 97 and 98 below.

---

[16] See paragraphs 32 (n. 9), 39, 44, 45, 49, 51, 54, 66, 69, 72, 73, and 152.

**B.      Monitor's Access to Information and Communications**

88.      The Defendants will ensure that the Monitor will have access to information

sufficient, in the Monitor's judgment, for him/her to perform his/her duties, including evaluating

the Defendants' compliance with this Consent Decree and other binding obligations. At a

minimum, such access will include: (a) the ENCORE system and any other relevant student

databases and information systems, and (b) any and all documents, records, and information to

which Defendants have access, including student files created and maintained by private

providers, but excluding documents and information protected by the attorney-client or

work product privilege. The Monitor's access includes access for the purpose of verifying

information and documents. Defendants will promptly respond to requests for documents or

information  from the Monitor. The Monitor will be free to communicate with any and all

persons whom he/she decides should be consulted. As needed to perform his/her job, and in the

Monitor's sole discretion, the Monitor may keep the identify of his/her sources confidential.

Defendants will make all reasonable efforts to ensure that the Monitor will have such access as

the Monitor desires to educational placements, both public and private, and to other

public agencies that serve class members. Both class counsel and Defendants will use their best

efforts to facilitate access to class members. The Monitor will be required to safeguard all

information that is made confidential by federal or D.C. law.

89.      The Monitor may share with Defendants and/or class counsel any and

all documents, records, or information that the Monitor or his/her consultants, agents or

staff obtain or create, subject to appropriate confidentiality provisions in appropriate

circumstances.

Section V.B. (cont'd)

90.     The Monitor may communicate *ex parte* with Defendants and their agents and employees, Defendants' counsel, class members, class counsel and their agents and employees, and special education attorneys.

91.     The Monitor may have ex parte communications with the Court at any time that either the Monitor or the Court determines that such a communication would be beneficial without prior notification to or consultation with the parties. However, the Monitor may not have ex parte communications with the Court on the merits of matters pending before the Court including applications for relief or for judicial determination under this Consent Decree.

92.     The Monitor will have access to the IDELR when on DCPS premises.

93.     The Monitor, with parental consent, may observe IEP meetings and due process hearings.   The Monitor may visit schools and speak freely with school personnel and students.  The Monitor may observe the training provided to Hearing Officers by the SHO.

## C.     Defendants' Agreement with the Monitor

94.     The Defendants will enter into a Memorandum of Agreement ("MOA") with the Monitor for an initial three-year term to begin on the date the Court appoints the Monitor. The MOA shall incorporate the Monitor's responsibilities as set forth in this Consent Decree and establish a billing and payment mechanism for the Monitor's fees and expenses. The Monitor will be paid fees plus reasonable expenses, including administrative support of his/her own choosing. The MOA may contain an annual ceiling on fees to be paid to the Monitor; however, a ceiling may be imposed only by agreement of class counsel or the Court.
If a ceiling is imposed, and the Monitor is asked to perform duties not explicitly

Section V.C. (cont'd)

required under the terms of this Consent Decree or the Monitor must expend more time

or resources on activities required under this Consent Decree than contemplated by the

parties or the Monitor, the Monitor may request additional funds and/or other resources

and such request shall not be unreasonably denied.

95.     Each fiscal year the Defendants shall set aside sufficient funds to cover the fees

and expenses of the Monitor and any consultants, experts, staff, associates, assistants and/or

administrative support required by the Monitor. On a monthly basis, the Monitor shall submit to

the Court, OGC, Defendants' counsel, and class counsel an account of his/her activities and an

invoice for the reasonable fees and expenses incurred in the performance of his/her duties under

this Consent Decree. The Defendants shall review the account of activities and invoice for fees

and expenses, and shall have ten (10) days to file any objections to the proposed invoice. Absent

any objections, Defendants shall pay such reasonable fees and expenses within thirty (30)

calendar days of receipt of the invoice or as may be ordered by the Court.

96.     Unless the Blackman and Jones cases have been dismissed, the Monitor's term

will be renewed for another three year period at the end of the initial three year term, as well as

at the end of each three year period thereafter, unless either party has requested and the Court has

ordered that the Monitor be replaced.  As long as any aspect of this case is pending, the

Defendants will be required to have a written agreement in the form of an MOA or contract with

the Monitor. There shall be written into the agreement with the Monitor the Defendants' ability

to cancel the agreement, without penalty, when both the Blackman and Jones portions of the case

are dismissed.

97.     The Monitor may contract or enter into agreements with experts, consultants, staff

and other associates, and may also retain administrative support of his/her own choosing, to

Section V.C. (cont'd)

assist him/her in carrying out his/her responsibilities under this Consent Decree. Compensation for these experts, consultants, staff, associates, assistants and/or administrative support will be provided by the Defendants.   All invoices for such individuals shall be submitted to the Court, OGC, Defendants' counsel, and class counsel, and shall be paid in the same manner as invoices for the Monitor as stated in paragraph (2) above.

98      Prior to entering into a contract or agreement with a deputy to the Monitor or other expert, the Monitor shall submit a statement of work and the identity of the proposed deputy or expert to class counsel and Defendants for approval. In addition, the Monitor shall submit a proposed schedule of fees for the deputy or expert to Defendants for approval and budgeting. The Monitor's request must be reasonable, and the Defendants shall not unreasonably deny the Monitor's request. If the Monitor or class counsel believes that the Defendants unreasonably denied a request for funding for a deputy or expert, the Monitor or class counsel may submit the request to the Court. If the Court finds that the Defendants unreasonably denied the request, the Court may order the Defendants to pay all or part of the Monitor's request. All invoices for a deputy or an expert support shall be submitted to the Court, OGC, Defendants' counsel, and class counsel, and shall be paid in the same manner as invoices for the Monitor as stated in paragraph 95 above.

99.      The Defendants shall provide the Monitor with reasonable office space, including a computer and access to the internet, as well as computer access to the special education student information system (currently known as ENCORE) and, as requested by the Monitor, other data systems.

Section V.C. (cont'd)

100.    The Monitor may be dismissed and replaced a) upon agreement of the parties, subject to the Court's approval, or b) by the Court upon petition of any party when exceptional circumstances are shown.

**D.     Evaluation Team**

101.    By October 1, 2006, the Monitor will establish an "Evaluation Team"(hereinafter "Team"), the primary purpose of which is to help Defendants achieve compliance with their obligations under the Consent Decree regarding timely implementation of HODs/SAs (set forth at paragraphs 41 & 42).  The Team will, *inter alia*:

a.      Evaluate Defendants' progress in achieving compliance with their obligations under the Consent Decree regarding timely implementation of HODs/SAs, identify barriers to compliance, and recommend actions and strategies for overcoming barriers to compliance.

b.      Make written reports, per paragraph 106 below, describing its activities, findings, and recommendations.

102.    The Team will decide the means by which it goes about its work, but will seek input from the parties.  The Team will have access to such information, documents, and personnel as are reasonably necessary in the Team's judgment to perform their responsibilities. Team members, and consultants and staff of the Team, may visit schools and talk with school personnel and students,  Team members, and consultants and staff of the team, may, with parental consent, observe IEP meetings and due process hearings.

103.    The Evaluation Team will consist of:

a.      The Monitor;

Section V.D. (cont'd)

b.      Clarence Sundram,[17] an expert identified by the Plaintiffs and mutually agreed upon by the parties;  and

c.      Rebecca Klemm,[18] an expert identified by the Defendants and mutually agreed upon by the parties.

If the parties are unable to agree on the members of the Team, including any replacement needed due to resignation or incapacity, the matter shall be resolved pursuant to the ADR provision of this Decree.

104.    The expenses of the Team shall be included in the Monitor's budget, but shall not exceed $100,000 annually.  The Team budget shall include reimbursement for: the time and travel expenses of the expert identified by Plaintiffs pursuant to paragraph 103(b) above and the time and travel expenses of any staff or consultants hired by the Evaluation Team.  The following items will not be paid out of the Team's budget:  any expenses of the Monitor and any expenses of the expert identified by the Defendants pursuant to paragraph 103(c) above including for time and travel. To the extent practical, the Evaluation Team will attempt to obtain pro bono assistance to assist the Team in carrying out its work.

105.    The Team will use multiple sources of information, including data from Defendants' data systems, interviews, and in-depth case reviews of samples of cases:

a.      An in-depth review of a case will include a review of relevant files and interviews with significant individuals in the case, including parents, the child as appropriate (at the discretion and consent of the parent and/or child), the responsible special education

---

[17] Clarence Sundram's Curriculum Vitae is attached as Exhibit G.

[18] Rebecca Klemm's Curriculum Vitae is attached as Exhibit D.

Section V.D. (cont'd)

coordinator, and other individuals with a role in implementing the HOD/SA.  The Team may, in

their discretion, seek to interview the Hearing Officer who presided over the DCPS

administrative due process hearing.

        b.      The samples reviewed need not be statistically significant.

    106.    The Team will make written reports describing its activities, findings, and

recommendations.

        a.      The first report will be due March 15, 2007.  The Team will make an

annual report no later than January 15, 2008 and thereafter at twelve-month intervals (January

15, 2009, January 15, 2010, etc.).

        b.      Beginning in 2007, the Team will also make at least one interim report

during each year, preferably half way through the calendar year (June 15, 2007, June 15, 2008,

etc.).

        c.      Thirty days prior to issuing an annual or interim report, the Team will

provide a draft of the report to the parties to this Decree and invite their comments. The parties

will provide the Team with any comments no later than ten (10) calendar days after receiving the

draft report. Based on the parties' comments, the Evaluation Team may, in its discretion, revise

its report.

        d.      Each annual and interim report will report on Defendants' progress in

achieving compliance with its obligations under the Consent Decree regarding timely

implementation of HODs/SAs, remaining barriers to compliance, and recommendations for

actions and strategies to overcome such barriers.  The reports will be provided to Defendants and

plaintiffs' counsel.

Section V.D. (cont'd)

107.    The Team, individual Team members, and any consultant or staff of the Team, may freely communicate (ex parte) with any party or counsel at any time, including communicating about its activities, findings, or recommendations.

108.    Team members, and consultants and staff of the Team, will act in a manner so as to minimize disruption to the routine operations of the school system.

109.    The Team will operate on an ongoing basis until compliance with the Consent Decree is achieved or the Monitor determines and the parties agree that there is no longer a need for the Evaluation Team.

110.    The reports generated by the data system (Section IV.F.) and the reports of the Evaluation Team may be used as evidence in this case, including in the annual reassessment and, if appropriate, renegotiation of the terms of the Consent Decree provided for in Section IV.C. (upward adjustments) of the Decree.

## E.    Alternative Dispute Resolution (ADR) Procedure

111.    Unless otherwise specified in this Decree, a party must utilize the ADR procedure before seeking relief from the court.

    a.    Unless otherwise agreed by the parties, for disputes involving Sections IV.A., IV.C., and IV.I. the parties will utilize Michael Lewis, Linda Singer or Judge (Ret.) Richard Levie of JAMS at the Washington, D.C. Resolution Center or Judge (Ret.) Gregory Mize to serve as the ADR Specialist(s).  The parties will use JAMS and Mize on a rotating basis, depending on availability.

    b.    For disputes involving other matters, the process shall be as follows.  In the interest of preserving public funds, the parties will, when possible, utilize ADR services that are provided without cost.

Section V.E. (cont'd)

i.      Subject to Court approval, the parties will seek the assistance of the ADR services of the United States District Court.

ii.      If such assistance is not available, and if consistent with the rules of this Court, the parties may informally seek the assistance of District Court's Mediation Program in providing a list of suitable individuals who will serve pro bono.  The parties will make their best efforts to agree on an ADR Specialist from the list provided, and such agreement shall not unreasonably be withheld.

iii.      If an ADR Specialist(s) who will work pro bono is not selected by the date an initial response is due by Defendants under paragraph 113 below, the ADR Specialists named in paragraph (a) above shall be utilized.

112.    The ADR Specialist is entrusted with the dual function of: (1)  facilitating a mutually satisfactory resolution of disputes between the parties consistent with the terms and goals of this Consent Decree, and (2) in the absence of a mutually acceptable resolution, providing the Court a report and recommendation for resolving the dispute.  A trial-type proceeding is not contemplated, and the formal rules of evidence and civil procedure shall not apply.  However, each party shall have the opportunity to present a case, including (i) submitting supporting documentation and (ii) in exceptional cases and at the discretion of the ADR Specialist, the testimony of witnesses.

113.    Class counsel will give Defendants notice in writing of their intent to seek relief under the ADR procedure of this Consent Decree.  The notice shall specifically state the provision(s) of the Consent Decree at issue.  Defendants will respond within 14 days of receipt of notice by demonstrating compliance or that a plan has been put into effect to attain compliance within a reasonable period of time.  If Defendants' response is not satisfactory to

Section V.E. (cont'd)

class counsel, class counsel may within 10 days of receipt thereof forward the notice,

Defendants' response, and (at their option) a reply to Defendants' response to the ADR Specialist

for resolution.  If such a filing is made by class counsel, then the parties, with the active

assistance of the ADR Specialist, will attempt to reach agreement, within 30 days of the date of

the filing, about how to address class counsel's complaint.  During the 30 day period, the ADR

Specialist may communicate ex parte with Defendants and their agents or employees,

Defendants' counsel, class members, class counsel, class counsel's agents,  or the Monitor.  Also,

during the 30 day period, either party or the Monitor may submit additional relevant information

to the ADR Specialist and the other parties.   If the parties reach agreement within the 30 days,

their written agreement will be binding upon both parties and shall be as enforceable as any other

provision of this Consent Decree.  If the parties cannot agree within the 30 days, the ADR

Specialist shall have an additional 20 days in which to issue a report and recommendations. The

recommendations shall include specific corrective actions Defendants must take to achieve

compliance as soon as possible with the provision(s) at issue.  If neither party objects to the ADR

Specialist's recommendations within 14 days of their receipt, the ADR Specialist's

recommendations will be binding upon the parties and shall be as enforceable as any other

provision of this Consent Decree.  If a party disagrees with the ADR Specialist's report and

recommendations, the party must so notify the ADR Specialist within 14 days of receipt thereof.

Once the ADR Specialist has been notified that a party objects, the ADR Specialist shall then

forward the report and recommendations to the Court and contemporaneously serve the parties

and the Monitor with a copy of the Court filing.  Unless the Court directs otherwise, both parties

and the Monitor will file comments within 14 days from the date of receipt of the report and

recommendations filed with the Court.  Thereafter, the plaintiff class may file a motion for

Section V.E. (cont'd)

enforcement of the Consent Decree provisions at issue, and after both parties and the Monitor

have had an opportunity to be heard as directed by the Court, the Court will enter an order

resolving the matter.

      a.    If Defendants fail to comply with any of the results of ADR pursuant to

Section V.D. class counsel may file an appropriate motion with the Court.  Unless otherwise

directed by the Court, the Defendants shall have 20 days after their receipt of the motion or

recommendation in which to file an opposition.  Within 20 days after their receipt of such

opposition, class counsel may file responses. After both parties have had the opportunity to file

their briefs, the Court may hear additional evidence and will decide the motion.

      b.    The Court shall decide de novo all objections to the report and

recommendations of the ADR Specialists unless the parties stipulate with the Court's consent that

the ADR Specialists' report and recommendations will be reviewed only for clear error.

    114.    Class counsel will not seek judicial enforcement of this Consent Decree under the

circumstances set forth in paragraphs a and b below. However, class counsel reserves the right to

seek the assistance of the Monitor or to use the ADR procedure at any time the Defendants are

not in full compliance with this Consent Decree.  If class counsel uses the ADR procedure under

the circumstances set forth in paragraphs a and b, the decision of the ADR Specialist will be

final.  Neither party will have recourse to the Court to overturn the decision, and the decision

will become a binding obligation.

      a.    As to the Blackman portion of the case, class counsel shall not seek

judicial enforcement of Section IV.D. (except for paragraph 53) (Student Hearing Office) of this

Consent Decree if  the Defendants are in compliance with paragraphs 29 and 30 above, or any

upward adjustments thereto, regarding holding timely due process hearings.

Section V.E. (cont'd)

        b.      Class counsel will not seek judicial enforcement of Sections IV.F. (Data System); IV.G (Parent Service Center); and IV.H (Evaluations) when Defendants are in compliance with paragraphs 41-43 or any upward adjustments thereto.

**F.**      **Defendants' Agreement with the ADR Specialist**

      115.     The Defendants will enter into MOAs with the ADR Specialists upon Final Approval of this Consent Decree by the Court. The MOAs will provide that: (a) the ADR Specialist will be paid on an hourly basis, plus reasonable expenses, (b) the ADR Specialist shall submit to the Court and to the OGC, Defendants' counsel, and class counsel an account of his/her activities and an invoice for fees and expenses incurred in the performance of his/her duties under this Consent Decree, and (c) the Defendants shall review the account of activities and invoice for fees and expenses, and shall have ten (10) days to file any objections to the proposed invoice. Absent any objections, Defendants shall pay such reasonable fees and expenses within thirty (30) calendar days of receipt of the invoice, or as may be ordered by the Court.  As long as any aspect of this case has not been dismissed, the Defendants will be required to have an agreement or contract with the ADR Specialists. The agreements or contracts with the ADR Specialists shall include provisions which permit Defendants to cancel the agreement or contract, without penalty, when both the Blackman and Jones portions of the case are dismissed.

      116.     The ADR Specialists may be dismissed and replaced a) upon agreement of the parties, subject to the Court's approval or b) by the Court upon petition of any party when exceptional circumstances are shown.

# VI.    Reporting

**A.    The Defendants Will Provide the Following Reports**

117.    Defendants will provide class counsel and the Monitor with the following reports:

a.    the quarterly Special Conditions Reports relevant to the provisions of this Consent Decree and the Annual Performance Report, or their equivalent, submitted to the Office of Special Education Programs of the United States Department of Education within seven days of submission, and all corresponding responses received from the Department of Education within seven days of receipt;

b.    a monthly listing of due process hearing requests pending without a timely hearing;

c.    a monthly listing of due process hearing requests not listed in item (b) pending without an HOD having been timely issued;

d.    a monthly listing of HODs and SAs which are overdue for implementation. Unless otherwise requested, Defendants shall submit the monthly reports to the Monitor and class counsel in electronic form.  These reports are also to include information on all continuances that have been granted, including the number of continuances, so that class counsel and/or the Monitor can determine whether the cases for which a continuance was granted should be excluded from the compliance calculations pursuant to paragraphs 31 and 32.[19] These reports will be generated by ENCORE or another data management system, the accuracy of which will be verified by an annual audit.  Defendants shall provide class counsel with copies of

---

[19] The Defendants will ensure that the Monitor and the Plaintiffs have access to copies of the orders granting continuances.

Section VI.A. (cont'd)

all such audits within 5 days of their completion. In addition, Defendants will provide the

Monitor and class counsel with quarterly reports, in a form acceptable to the Monitor,  on the

Defendants' compliance with the provisions of the Decree that are not covered by the monthly

reports listed in a-d above or by reports required in paragraphs 46, 66, 121 and 122 of  this

Decree.

      118.    When possible, Defendants will submit reports to the Monitor and class counsel

in electronic form.

      119.    Defendants will provide a list of the Jones initial backlog of class members,

excluding class members whose HOD or SA was issued before March 1, 2006 but became due

on or after March 1, 2006.  This list will identify the student's name, the date the HOD or SA was

issued, the parent representative if any, and a listing of the elements of the HOD or SA that have

not been implemented in a timely manner and the date by which they were ordered to take place

or agreed to be implemented. This list will be provided to class counsel within 60 days of Final

Approval of the Consent Decree.

      120.    Defendants will compile a list of every student who ever qualified as a class

member in this litigation so that DCPS may identify those students to whom the Blackman/Jones

Compensatory Education Catalog will be sent. This list will be provided to class counsel when it

is generated but not later than 60 days after Final Approval of this Consent Decree.

      121.    Starting with the first quarter after the Consent Decree is signed by the parties,

DCPS will provide to the Monitor and class counsel quarterly reports on the status of Encounter

Tracker (ET) implementation until the Monitor is satisfied that implementation is complete in all

schools. Upon request, DCPS will provide the Monitor access to reports and data regarding the

Section VI.A. (cont'd)

timely implementation of IEPs and provision of related services to students in all DCPS schools

and any available ENCORE/ET management reports.

122.     Within 30 days after the parties sign this Consent Decree, the Defendants will

begin providing the following reports on the parent service center to the Monitor and class

counsel: (a) special education service center monthly reports, and (b) the results of any parent

satisfaction surveys.

123.     All other reports that the Monitor reasonably requests.

124.     Nothing in paragraphs 117-123 above shall be construed to in any way limit the

Monitor's or the Evaluation Team's access to information pursuant to paragraphs 88, 90, 93, 99,

102, 105 and 107 above.

**B.     Class Counsel Will Circulate the Following Reports**

125.     Within a reasonable time after reports are provided by the Defendants, class

counsel will disseminate all reports that do not contain students' identifying information to the

DC Special Education Roundtable (or similar entity), the Parent Training and Information Center

(currently Advocates for Justice in Education), and to members of the special education bar who

have asked to be included on the dissemination list.

**C.     Access to Records for Verification Purposes**

126.     Defendants will, upon class counsel's request, provide class counsel and/or class

counsel's designee with access to a sufficient sampling of records to verify the information

contained in any of the reports required under this Consent Decree.  Class counsel will provide at

least 7 business days notice to DCPS that they seek a site visit for document review including the

purpose of the review.

**VII.     Notice of Proposed Consent Decree and Dissemination to DCPS Staff**

127.    Notice will be provided as directed by the Court.

128.    Defendants will post the Consent Decree on their Website.

129.    The Superintendent has issued an announcement agreed on by the parties that was transmitted to all schools that serve D.C. special education students. The announcement included an overview of this Consent Decree from the Superintendent that described why there is a Consent Decree, the Superintendent's goals and vision for serving special education students, expectations of local schools, support that will be available from Central Administration, and the consequences that will occur if children are discriminated against or expectations are not met. During the pendency of this Consent Decree, at the beginning of each school year, the Superintendent will transmit an update on the Blackman/Jones litigation to each school servicing D.C. special education students. The update will provide an assessment of how far the Defendants have come in meeting the provisions of the Consent Decree and will also describe any challenges that have arisen and the plan to meet those challenges. The Defendants will prepare the update after consultation with class counsel. If the parties are unable to agree on the language of the update, the Monitor shall decide the matter.

130.    Materials disseminated under the preceding paragraph above shall be posted on Defendants' website within 10 days of dissemination and maintained on the website during the pendency of this litigation.

## VIII.   Miscellaneous Provisions

**A.      Res Judicata Effect; Relief Available to Plaintiffs and Class Members**

131.     This Consent Decree resolves the parties' rights and responsibilities only as they relate to the timely disposition of special education due process hearing requests and the timely implementation of HODs and SAs as required by the IDEA and the relevant provisions of the DCMR.  The parties do not intend this case to resolve claims regarding any other aspect of the implementation of the IDEA.

132.     When either the Blackman or Jones portion of this Consent Decree is terminated pursuant to Section X, the Court will enter an order dismissing that portion of the case without prejudice to a future claim that a standard of compliance greater than the standard set out in X is required by federal or DC law.

133.     Defendants' compliance with the overall requirements and timetables adopted in this Consent Decree shall not relieve them of their obligations to individual class members;  this Consent Decree shall not affect the right of any individual class member to a) access the range of educational and support services guaranteed by the IDEA and local law; b)  seek any and all relief that is otherwise available through administrative proceedings,  mediation, and the state complaint process and; c) bring judicial actions for relief available under local and federal law,[20] including IDEA.

134.     Any individual class member experiencing delays in the issuance of HODs or the implementation of HODS/SAs may file a motion with the Court in this case requesting

---

[20] This Agreement is not meant to resolve any claims that class members may have under any laws other than the IDEA, such as, but not limited to, the Americans with Disabilities Act, the Rehabilitation Act (Section 504), and the U.S. Constitution.

Section VIII.A. (cont'd)

emergency relief and such class members are not limited to the relief set forth in this Consent

Decree. Such motions will be addressed consistent with the Court's Opinion and Order of

Reference issued on February 12, 1999 appointing a Special Master for Preliminary Injunctions

and any subsequent modifications thereto.

## B.       Commitment of Resources

135.    Defendants shall notify class counsel and the Monitor in the event that Defendants

believe that a lack of funds or anticipated lack of funds makes it impossible for Defendants to

comply with their obligations under this Consent Decree. Defendants shall also notify class

counsel and the Monitor of any actions they are taking or contemplate taking to obtain the

necessary funds. Defendants shall also notify class counsel and the Monitor of any adjustments

in performance Defendants anticipate making in view of a lack of funding. Plaintiffs reserve

their right to contest any failure to perform under this Consent Decree based on Defendants'

assertion of lack of funds. If the Defendants believe that appropriations law impacts their legal

ability to satisfy the requirements of this Consent Decree, they may bring this to the Court's

attention by motion or other appropriate means.

## C.       Parties Agree to Defend Consent Decree on Appeal

136.    In the event that the Court gives Final Approval and the Court's order is appealed,

the parties shall abide by the terms of the Consent Decree during the pendency of the appeal. The

parties agree to defend the Consent Decree in any federal or state proceeding in which the

Court's approval of the Consent Decree or the Consent Decree itself is challenged.

## D.       Effective Date

137.    This Consent Decree is effective with regard to each signatory on the date it is

signed by that signatory unless otherwise specified.

Section VIII (cont'd)

E.     **Anti-Deficiency Act**

138.    Defendants assert that they are subject to the federal and District Anti-Deficiency Acts, 31 U.S. Code §1341 and D.C. Code §§ 1-206.03(e), 47-105, 47.355.01, and § 446 of the Home Rule Act, D.C. Code § 1-204.46. Plaintiffs assert that these Anti-Deficiency Acts do not relieve Defendants of their obligation to comply with the provisions of this Consent Decree. Because there is no actual dispute at this time concerning the availability of funds, the parties preserve their respective positions for future resolution by the Court, if necessary.

F.     **Procurement**

139.    Under this Consent Decree, the Defendants are not bound by the D.C. Procurement Practices Act, D.C. Code § 2-301.01 et seq., any other District or federal law relating to procurement, and any regulations thereunder.

G.     **Amending the Consent Decree**

140.    The parties reserve the right to move to amend this Consent Decree to conform to changes in applicable law and regulations, subject to the prevailing legal standard for modification of a Consent Decree.

H.     **Severability**

141.    With the exception of Section V.E. and paragraph 58 referring to the OAH, all individual provisions in this Consent Decree shall be severable; if any one or more such provision is determined by this Court to be in any way unenforceable, such determination shall have no effect whatsoever on any of the remaining paragraphs, provisions, clauses, sections, sentences, or words of this Consent Decree.   If any provision of the Consent Decree is determined to be unenforceable in any way, plaintiffs may seek from this Court alternative relief

Section VIII.H. (cont'd)

to the relief provided in the Consent Decree; the fact that the matter is already addressed in the

Consent Decree shall not preclude Plaintiffs from obtaining alternative relief.

**I.      Consistency**

142.     If there are any conflicts between the Consent Decree and any of the attached

documents, the provisions of the Consent Decree shall control.

**IX      Attorneys' Fees**

**A.      Plaintiffs are Entitled to Attorneys' Fees.**

143.     In light of the Court's finding on liability, Plaintiffs are the prevailing party and,

as such, class counsel are entitled to reasonable attorney fees.

144.     Plaintiffs will submit to the Defendants a request for interim attorneys fees and

costs.  After Plaintiffs submit their request, the parties will attempt in good faith to negotiate a

reasonable interim attorney fees award.  If, after ninety (90) days from Plaintiffs submitting their

request, the parties are unable to agree upon a figure, the parties agree to jointly request court

appointment of a magistrate judge to resolve the issue.  If such mediation is unsuccessful after 90

days, class counsel will submit their fee application to the Court.

**B.      Plaintiffs Attorneys' Fees for Monitoring**

145.     Beginning after the Court approves the Consent Decree, Plaintiffs' counsel will

file with the Defendants on a quarterly basis an application for fees and costs associated with

monitoring and efforts to secure implementation or enforcement of the Consent Decree or other

binding obligations.  After Plaintiffs submit their request, the parties will attempt in good faith to

negotiate a reasonable fee award.  If, after 45 days from Plaintiffs submitting their request, the

parties are unable to agree upon a figure, class counsel may submit a fee application to the Court.

Section IX.B. (cont'd)

If the fees and costs approved by the Court are not paid by Defendants within 30 calendar days

of said approval, interest will accrue thereafter at the statutory rate.

## X.    Termination of the Litigation

### A.    Termination of Blackman Case

146.    After December 15, 2006, Defendants may file a motion seeking termination of

the Blackman case if:

      a.    During the preceding 12 months, 90% of hearing requests were

timely adjudicated (by the issuance of a final HOD) or settled; and

      b.    No due process hearing requests are more than 90 days overdue.

147.    Before filing a motion for termination, Defendants shall give written notice to

class counsel and the Monitor that they believe they are in compliance with paragraph 146 a & b.

If either class counsel or the Monitor questions the Defendants' compliance, class counsel or the

Monitor, within 30 days of receipt of Defendants' notice, shall so notify Defendants in writing of

the grounds on which they question compliance. If class counsel and the Monitor are satisfied

that such compliance has been shown, the parties shall file a joint motion seeking dismissal of

the underlying *Blackman* portion of the case, which includes Sections IV.A (timely hearings);

and IV.D. (Student Hearing Office).  Plaintiffs shall not unreasonably refuse to join in such a

motion. In the event that class counsel refuse to join in such a motion as requested by

Defendants, Defendants may, on their own, file an appropriate motion with the Court.  For

purposes of determining whether Defendants are in *Blackman* compliance for termination, the

requirements set forth in paragraph 146 a & b have to be met absolutely.  Defendants waive any

right they may otherwise have to argue that they are in "substantial compliance" with the

Section X.A. (cont'd)

requirements of paragraph 146 a & b if they are close to meeting them but have not absolutely

met them.

**B.      Termination of Jones Case**

148.    Defendants may file a motion seeking termination of the Jones case when the

following criteria have been met:

a.      Defendants have eliminated the Jones initial backlog; and

b.      During the preceding 12 months, 90% of HODs/SAs were timely

implemented during the measurement period; and

c.      No case is more than 90 days overdue.[21]

149.    Before filing a motion for termination, Defendants shall give written notice to

class counsel and the Monitor that they believe they are in compliance with paragraph 148 a-c.

If either class counsel or the Monitor questions the Defendants' compliance, class counsel or the

Monitor, within 30 days of receipt of Defendants' notice, shall so notify Defendants in writing of

the grounds on which they question compliance.  If class counsel and the Monitor are satisfied

that such compliance has been shown, the parties shall file a joint motion seeking dismissal of

the underlying Jones portion of the case, which includes Sections IV.C. (timely implementation

of HODs and SAs).  Plaintiffs shall not unreasonably refuse to join in such a motion. In the event

that class counsel refuse to join in such a motion as requested by Defendants, Defendants may,

on their own, file an appropriate motion with the Court. For purposes of determining whether

---

[21] Pursuant to paragraph 45 above, when a case in the Jones subsequent backlog has been overdue longer than the timeframes permitted in this Consent Decree (i.e., 180, 150, 120, 90 days),  Defendants may present written information to the Monitor and to plaintiffs' counsel to establish that there are exceptional circumstances that warrant an exemption.  The Monitor, at his/her discretion, may grant an exemption to the specified timeframes upon a showing of exceptional circumstances.

Section X.B. (cont'd)

Defendants are in *Jones* compliance for termination, the requirements in paragraph 148 a-c have

to be met absolutely.  Defendants waive any right they may otherwise have to argue that they are

in "substantial compliance" with these requirements if they are close to meeting them but have

not absolutely met them.

## C.     Termination of Consent Decree

150.    When both the Blackman and Jones portions of the case are dismissed, as

described in paragraphs 146 through 149, then the remaining provisions of this Consent Decree

shall cease to be in effect and any proceedings initiated by class counsel or the Monitor related to

such provisions shall terminate.

## XI.     Students in Charter Schools

151.    The parties will ask the Court to resolve the following legal question:

> "Are the Defendants legally responsible for ensuring timely hearings and
> timely implementation of HODs and SAs for charter school students?"

152.    If, after briefing and argument, the Court decides that Defendants have such

responsibility for all or a portion of charter school students:

a.     Paragraph 22 of this Consent Decree (definition of "school") will be

conformed to reflect the Court's opinion.  If the Court decides that the Defendants have

responsibility for timely hearings and timely implementation of HODs and SAs for all charter

school students, the definition will remain unchanged.  If the Court decides that the Defendants

have responsibility for timely hearings and timely implementation of HODs and SAs for only a

portion of charter school students, the definition will be changed to include only the schools in

which those charter school student are enrolled.

Section XI (cont'd)

b.      The Consent Decree will be fully applicable to the charter school students

for whom the Court determines Defendants have responsibility, except that the provisions of

Section IV.F. (data system) will not fully apply.  Within 45 days of the Court's decision, the

parties will negotiate an agreement on whether and in what way the provisions of Section IV.F.

shall apply to those students.  If the parties cannot reach agreement, they will make a

presentation to the Monitor, who will decide the matter.

c.      The definition of the plaintiff subclasses will be modified to conform to

the Court's opinion.

153.    If the Court decides that the Defendants do not have legal responsibility for

ensuring timely hearings and timely implementation of HODs and SAs for some or all charter

school students:

a.      The definition of "school" in paragraph 22 of this Consent Decree will be

changed to conform to the Court's opinion.

b.   The definition of the Plaintiff subclasses will be modified to exclude those

charter school students for whom the Defendants do not have responsibility.

c.      Neither the pendency of this case nor the existence of this Consent Decree

shall prevent the filing or the prosecution of a separate lawsuit addressing compliance with

IDEA's requirements for timely hearings and timely implementation of HODs and SAs for the

students excluded from the Plaintiff subclasses pursuant to b above.

## XII.  Continuing Jurisdiction

154.    The Court will retain jurisdiction over this case for purposes of interpreting,

monitoring, and enforcing compliance with all provisions of this Consent Decree, binding

Section XI (cont'd)

agreements of the parties, binding decisions of the ADR Specialist, and subsequent orders of the

Court.

Respectfully submitted,

ON BEHALF OF PLAINTIFFS:

_____/s/_____
Ira Burnim Bar No. 406154
Tammy Seltzer Bar No. 453115
Bazelon Center for Mental Health Law
1101 Fifteenth Street, NW, Suite 1212
Washington, DC 20005-2005
Phone: (202) 467-5730 x 129

Alisa H. Reff Bar No. 423113
DRINKER BIDDLE & REATH LLP
1500 K Street, NW Suite 1100
Washington, DC 20005-1209

Charles Moran Bar No.970871
601 Pennsylvania Avenue, NW
Suite 900, South Building
Washington, DC 20004

ON BEHALF OF DEFENDANT-
INTERVENORS

_____/s/_____
Lisa Coleman
General Counsel
Office of Administrative Hearings
441 4th Street, NW, Suite 870N
Washington, DC 20001
Phone: (202) 724-5477

Dated: July 26, 2006

SO ORDERED.

DATE: 8/24/06

ON BEHALF OF DEFENDANTS:

_____/s/_____
Robert Spagnoletti
Attorney General of the
District of Columbia

George C. Valentine
Deputy Attorney General
Civil Division

Edward Taptich
Chief, Equity Section II

Daniel A. Rezneck Bar No. 31625
Senior Assistant Attorney General
Equity Section II

Cary D. Pollak Bar No. 055400
Senior Assistant Attorney General
Equity Section II
441 4th Street, NW
6th Floor South
Washington, DC 20001
Phone (202) 724-6604

_____
PAUL L. FRIEDMAN
United States District Judge