UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
MIKEISHA BLACKMAN, et al.,          )
                                                    )
             Plaintiffs,                          )
                                                    )          Civil Action No. 97-1629 (PLF)
      v.                                            )             Consolidated with
                                                    )          Civil Action No. 97-2402 (PLF)
DISTRICT OF COLUMBIA, et al.,       )
                                                    )
             Defendants.                        )
_____)


OPINION

          This matter is before the Court on plaintiffs' petition for attorneys' fees and costs.

Plaintiffs seek $1,954,302.28 in fees, costs and expenses for the period from July 26, 2006

through December 31, 2008.  Defendants are not opposed to awarding plaintiffs' counsel some

amount in attorneys' fees and do not contest the amount of costs and expenses sought, but they

argue that the amount of fees requested should be reduced significantly.  After careful

consideration of the parties' papers, the oral arguments presented to the Court by counsel on

September 16, 2009, the relevant statutes and case law, and the entire history of this case, the

Court will grant plaintiffs' petition in part and deny it in part.[1]

_____

          [1]          The following papers were considered by the Court on this motion: Plaintiffs'
Petition for Post-Consent Decree Attorneys' Fees and Expenses ("Pet."); Defendants' Opposition
to Plaintiffs' Motion for an Award of Attorneys' Fees and Costs ("Opp."); Reply Brief in Support
of Plaintiffs' Petition for Post-Consent Decree Attorneys' Fees and Expenses ("Reply");
Defendants' Sur-Reply in Opposition to Plaintiffs' Motion for an Award of Attorneys' Fees and
Costs ("Sur-Reply"); and Defendants' Supplemental Opposition to Plaintiffs' Request for Fees
and Costs.

## I.  BACKGROUND

This case arose from the failure of the District of Columbia Public Schools ("DCPS") to meet its statutory obligations to special education students under the Individuals with Disabilities Education Act.  In 1997, plaintiffs filed a complaint in Blackman v. District of Columbia, Civil Action No. 97-1629, alleging that the defendants had failed to respond timely to students' and parents' requests for administrative due process hearings pursuant to the IDEA. Three months later a second suit was filed against the same defendants.  That case, Curtis v. District of Columbia, Civil Action No. 97-2402, concerned defendants' failure to implement Hearing Officer Determinations and settlement agreements timely as required by the IDEA.

The Court subsequently certified both the Curtis and Blackman cases as class actions under Rule 23(b)(2) of the Federal Rules of Civil Procedure, consolidated the cases, and consolidated the two classes to create a single class with two subclasses.  See Opinion and Order, Dkt. No. 70 (May 14, 1998); see also Opinion, Dkt. No. 81 (June 3, 1998).  The Blackman subclass was defined as:

> All persons now, and in the future, who present complaints to DCPS pursuant to Section 615(b)(6) of the IDEA and whose requests for impartial due process hearings under Section 615(f) of the IDEA and D.C. Mun. Regs. Tit. 5, § 3021.5 are overdue according to those provisions; and their next friends.

Opinion and Order, Dkt. No. 81 at 3 (June 3, 1998).  The Curtis subclass (now referred to as the Jones subclass) was defined as:

> All children, now and in the future, who are entitled to have DCPS provide them with a free appropriate public education [FAPE] and who have been denied same because DCPS either (a) has failed to fully and timely implement the determination of hearing officers, or (b) failed to fully and timely implement agreements concerning

2

> a child's identification, evaluation, educational placement, or
> provision of FAPE that DCPS has negotiated with the child's
> parent or educational advocate.

Id. at 4.[2]

In 1998, the Court granted summary judgment for plaintiffs on the issue of defendants' liability, finding there to be no genuine issue of material fact as to defendants' failure to meet their obligations to the class members under the IDEA.  See Opinion and Order, Dkt. No. 81 (June 3, 1998).  The Court did not at that time prescribe an immediate remedy.   In 1999, the Court appointed Elise Baach to serve as Special Master to ensure that individual class members' immediate and urgent claims were resolved promptly while the parties worked toward a class-wide remedy.

From 1998 through 2006 the parties engaged in settlement discussions in an attempt to craft an agreed upon class-wide remedy.  After various fits and starts by the parties, in 2005, the Court appointed Judge David S. Tatel and Amy Totenberg to serve as co-mediators.  With the invaluable assistance of Judge Tatel and Ms. Totenberg, the parties reached an agreement on remedies and submitted a proposed Consent Decree to the Court.  After a fairness hearing, the Court approved the Consent Decree on August 24, 2006.  Since the entry of the Consent Decree, plaintiffs' class counsel, the Monitor and the Evaluation Team appointed under the Consent Decree have monitored the defendants' compliance with the Consent Decree and with the IDEA.  While defendants still have not met the requirements of the IDEA or the Consent Decree, all parties involved agree that defendants are making progress.

---

[2]     Curtis v. District of Columbia subsequently was re-captioned Jones v. District of Columbia when Shaquette Curtis, the original named plaintiff, left the DCPS system.

II.  DISCUSSION

Plaintiffs seek attorneys' fees for the period beginning on the date on which they

submitted the Consent Decree to the Court, July 26, 2006, through the end of the 2008 calendar

year.  The Consent Decree provides that plaintiffs are entitled to attorneys' fees as prevailing

parties, including fees for time spent monitoring work performed after the entry of the Consent

Decree.  See Consent Decree ¶¶ 143, 145.[3]  The Court therefore need not engage in the

preliminary inquiry typical in attorneys' fees litigation regarding whether the fee applicant is the

prevailing party.  See Blackman v. District of Columbia, 59 F. Supp. 2d 37, 40-41 (D.D.C.

1999).

Upon concluding that plaintiffs are entitled to fees because they are prevailing

parties, the Court must determine whether the fees sought are reasonable by calculating "the

number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate" —

the so-called "lodestar" fee.  Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).  With regard to

reasonableness, plaintiffs must submit supporting documentation with the motion for attorneys'

fees, providing sufficient detail so that the Court can determine "'with a high degree of certainty'

that the hours billed were actually and reasonably expended, that the hourly rate charged was

reasonable, and that the matter was appropriately staffed to do the work required efficiently and

without duplicative billing."  Watkins v. Vance, 328 F. Supp. 2d 23, 26 (D.D.C. 2004) (quoting

In re Olson, 884 F.2d 1415, 1428-29 (D.C. Cir. 1989) (emphasis in original)); see also Hensley v.

---

[3]      The Consent Decree also anticipates that the parties will be able to negotiate an
agreed upon fee based upon quarterly fee submissions from plaintiffs to defendants.  See Consent
Decree ¶ 145.  The parties were unable to agree upon an amount for the time period in question,
resulting in the current fees litigation.  See Pet., Memorandum in Support ("Mem.") at 2 n.2.

Eckerhart, 461 U.S. at 433; Covington v. District of Columbia, 57 F.3d 1101, 1107 (D.C. Cir.

1995).  Once plaintiffs have provided such information, there is a presumption that the number of

hours billed and the hourly rates are reasonable; the burden then shifts to the defendants to rebut

plaintiffs' showing that the amount of time spent was reasonable and that the hourly rates for the

attorneys who worked on the matter were reasonable, considering their various skill levels and

experience for this kind of case.  See Watkins v. Vance, 328 F. Supp. 2d at 26.

Plaintiffs seek fees, costs, and expenses for work done by attorneys, legal

assistants, and other personnel at Steptoe & Johnson, the Bazelon Center, and Drinker Biddle &

Reath.[4]  They have submitted various declarations, timesheets, and bills in connection with their

fees petition.  Defendants challenge the amount of fees sought on the grounds that the hourly

rates proposed are too high, the number of hours spent on various tasks is unreasonable, and the

billing records submitted are inadequate.  In a supplemental filling, defendants also challenge the

amount of fees that may be awarded based on the congressional fee cap on IDEA attorneys' fees

in the District of Columbia.

*A.  Hourly Rates*

1.  Steptoe & Johnson Rates

Steptoe personnel have been involved in all aspects of the monitoring,

implementation, and enforcement of the Consent Decree along with lawyers from the Bazelon

Center.  See Pet., Declaration of Jane I. Ryan ("Ryan Decl.") ¶¶ 23, 24.  In addition, they have

served as "lead counsel" with regard to plaintiffs' requests for attorneys' fees.  See id. ¶ 23.

---

[4]      On this fees petition, plaintiffs seek only $770.00 for services provided by Drinker
Biddle & Reath.  Defendants have decided not to challenge this amount.  See Opp. at 14.

Steptoe seeks fees of $669,885.74 for work done by its attorneys, legal assistants, and summer associates at their customary billing rates.

In this Circuit, the billing rates that private attorneys and law firms normally charge their paying clients are presumptively reasonable for the purpose of fee awards, so long as they accord with the "established rates of lawyers of reasonably comparable skill, experience, and reputation in the D.C. legal community" for similar services.  Miller v. Holzmann, 575 F. Supp. 2d 2, 11, 13 (D.D.C. 2008) (citing Covington v. District of Columbia, 57 F.3d at 1110); see also In re Olson, 884 F.2d 1415, 1426 (D.C. Cir. 1989); Martini v. Fannie Mae, 977 F. Supp. 482, 485 (D.D.C. 1997).  While defendants acknowledge that there is a rebuttable presumption that such hourly rates are reasonable "for similar work [done] by those attorneys," Opp. at 4; see also Transcript of September 16, 2009 Argument ("Tr.") at 34-35, they argue that the Court must begin with a consideration of what a paying client would pay for that lawyer's work in the field of complex federal litigation, not what a client would pay for a non-litigator's work in his or her area of expertise.  Opp. at 4.[5]  Defendants argue that given the inexperience of many of the Steptoe personnel in complex federal litigation, awarding fees at their standard hourly rates

---

[5]    While defendants' briefs characterize the relevant market both as the specific market for complex federal civil rights litigation and the more general market for complex federal litigation, at oral argument counsel clarified that the District is referring to the market for complex federal litigation generally, not to a more specific civil rights niche.  See Tr. at 29.  See also Covington v. District of Columbia, 57 F.3d at 1111 ("[T]he District failed to show that a civil rights and employment discrimination market actually exists independent of attorneys who handle other types of complex federal litigation.  And even assuming, *arguendo*, the existence of such a submarket, the trial court found no evidence that submarket rates are lower than the prevailing rates in the broader legal market.") (internal citations omitted).

would be unreasonable.[6]

        In particular, defendants challenge the hourly rates of Steptoe personnel Jane

Ryan, Jennifer Key, Natalya Seay, Michael Stoll and Brian Symington on the ground that they

are not sufficiently experienced in complex federal litigation to bill at Steptoe's standard hourly

rates for the work they did in this case.[7]

        Jane Ryan, a partner at Steptoe & Johnson and a member of its Regulatory &

Industry Affairs Department, graduated from law school in 1982.  See Ryan Decl. ¶¶ 1, 4.  Ms.

Ryan's customary billing rate is $560 an hour, and she spent just over 300 hours working on this

case during the time period at issue.  Defendants argue that while Ms. Ryan may command that

hourly rate in her energy regulatory work, the rate should be reduced by 40% to $360 an hour,

because it is unlikely that any client would pay that rate to Ms. Ryan for federal statutory civil

---

        [6]     In support of their argument, defendants rely heavily on Simmonds v. New York
City Department of Corrections, 2008 U.S. Dist. LEXIS 74539 (S.D.N.Y. 2008), in which the
Court reduced the hourly rates billed by a private law firm, coincidentally also Steptoe &
Johnson, when "some aspect of the representation or the type of work involved would cause a
reasonable plaintiff to decline those rates."  Id. at *14.  The court in Simmonds focused on
whether a putative civil rights plaintiff would be willing to pay the same rates charged to
Steptoe's private clients in commercial or other civil litigation.  Courts in this district have not
adopted such a client focused approach, and as the Court noted at oral argument, it is desirable
for lawyers at major firms like Steptoe to participate in pro bono litigation even outside their
areas of expertise and to partner with public interest entities like the Bazelon Center to provide
pro bono services.  See Tr. at 5.

        [7]     Defendants also originally challenged the hourly rates proposed by Lindsay Lang,
Elisabeth Morse, Angela Scott, and Amanda Slater on the ground that they submitted insufficient
information regarding their federal court experience, but based upon additional information
provided by the plaintiffs, defendants have withdrawn their objections to these individuals'
hourly billing rates.  See Sur-Reply at 7-8.  For the reasons discussed infra at 9-10, therefore,
these lawyers will be credited for all of their years of practice, but Steptoe will be compensated at
Laffey rates rather than their normal hourly billing rates.  Defendants also challenged Barbara
Kagan's billing rate.  In response plaintiffs have withdrawn their billing request for Ms. Kagan.
See Reply at 17 n.15.

rights litigation or complex federal litigation generally, an area of the law in which she has little experience.  <u>See</u> Opp. at 5-6.  In the briefing, Ms. Ryan identified experience in only two federal cases, <u>see</u> Reply, Ex. A at 1, although at oral argument counsel clarified that these cases were only Ms. Ryan's then active federal cases and that she in fact had more federal litigation experience.  <u>See</u> Tr. at 16-17, 55.

        Jennifer Key, who graduated from law school in 1991, is Of Counsel in Steptoe's Regulatory & Industry Affairs Department.  <u>See</u> Ryan Decl. ¶ 14.  The primary focus of her practice is the representation of electric utilities before FERC in administrative proceedings.  <u>See</u> <u>id</u>.  Her customary billing rate is $495 per hour, and plaintiffs seek reimbursement for 55 hours of her time.  Plaintiffs do not seek fees for 22.25 hours of her time which, at $495 an hour, would have been an additional $11,013.75.  <u>See</u> Pet., Ex. 3B at 2.  Defendants argue that plaintiffs' submissions show that Ms. Key's experience consists almost exclusively of energy utility regulatory work and federal appellate litigation, not federal civil rights litigation or complex federal litigation.  Opp. at 7.  They argue that Steptoe therefore should be compensated for her time at the <u>Laffey</u> rate for an inexperienced federal litigator of $225 per hour.  <u>See</u> <u>id</u>.

        Parsing defendants' argument with respect to Ms. Ryan and Ms. Key, it is apparent that they suggest two separate ways to reduce the fees requested: first, that the Court treat Ms. Ryan as a lawyer with 4 to 7 years of experience (rather than her actual 27 years) and Ms. Key as a lawyer with 1 to 3 years of experience rather than 18; and second, that the Court substitute the <u>Laffey</u> rates for Steptoe's normal hourly rates to determine the hourly rate at which these two attorneys should be compensated based on the reduced years of experience with which

they are credited.  See Sur-Reply at 7-8.[8]  The Court has concluded that it is not appropriate to

reduce the years of experience with which Ms. Ryan and Ms. Key are credited for the purpose of

determining the hourly rates at which Steptoe should receive attorneys' fees.  Ms. Ryan's

extensive experience as a lawyer and her mature judgment have been much more important in the

monitoring, implementation and enforcement activities under the Consent Decree than her actual

litigation experience.  The same is true with respect to Ms. Key.  They will be given credit in the

Court's fee determination for their respective 27 and 18 years of legal experience.

On the other hand, as defendants point out, the presumption that a lawyer's

normal billing rate applies is only a rebuttable presumption.  In this case, the Court concludes

that applying the hourly rates charged by Steptoe to its paying clients would result in the District

of Columbia paying unnecessarily high attorneys' fees at a time when the District is in financial

straits.  See Tr. at 3, 7.  In its discretion, therefore, the Court will not require the District to pay

attorneys' fees at the hourly rate normally charged by some of the most expensive law firms in

the city.  Calculating the amount of fees to be awarded to Ms. Ryan and Ms. Key based on the

hourly rates in the Laffey matrix will fairly compensate for the excellent work those lawyers have

performed on behalf of the plaintiff class, at the same time recognizing the firm's commitment to

*pro bono publico*.  Accordingly, Steptoe will be compensated for the work performed by Ms.

Ryan and Ms. Key at the 2008-09 U.S. Attorney's Office rate for lawyers of their experience —

---

[8]     The Court understands defendants' reference to Laffey as a reference to the United
States Attorney's Office Laffey Matrix.  Available online at
http://www.justice.gov/usao/dc/Divisions/Civil_Division/Laffey_Matrix_8.html.

namely, $465 for Ms. Ryan and $410 for Ms. Key.[9]

During the time period for which plaintiffs seek fees, Natalya Seay had just graduated from law school, had not yet passed the bar, and was working at Steptoe as a summer associate.  Michael Stoll and Brian Symington also were working as summer associates at Steptoe, but had not graduated from law school.  Steptoe seeks compensation at its summer associate rates for these individuals — $251 per hour for Ms. Seay and $215 per hour for Mr. Stoll and Mr. Symington.  Defendants argue that these individuals should be compensated as paralegals at Steptoe's rate of $165 per hour because they had not graduated from law school or (in Ms. Seay's case) had not yet passed the bar.  See Opp. at 8-9.  The Court agrees with the defendants.  A rate of $165 an hour is sufficient compensation for services performed by non-lawyers, whether they be paralegals, law students, or recent graduates who have not yet been licensed to practice law.

2.  Bazelon Center Rates

As the Bazelon Center does not have established billing rates, it must use another method to demonstrate that the rates it proposes reflect prevailing market rates.  The court of appeals has suggested that in such a situation lawyers may make the necessary showing by relying on an updated version of the Laffey matrix maintained by the United States Attorney's Office or "their own survey of prevailing market rates in the community."  Covington v. District of Columbia, 57 F.3d at 1109; see also Watkins v. Vance, 328 F. Supp. 2d at 26 n.2 ("The

---

[9]        The defendants apply the 2008-09 Laffey rates, the most recent year for which plaintiffs request fees, to all of the time billed, and the Court will use the same year for the Laffey rates it applies.

prevailing market rate can be determined by reference to the so-called <u>Laffey</u> matrix.") (citing <u>Laffey v. Northwest Airlines, Inc.</u>, 572 F. Supp. 354 (D.D.C. 1983), *rev'd on other grounds*, 746 F.2d 4 (D.C. Cir. 1984)).  The Bazelon Center created its own matrix for its billing rates which are higher than the rates in the updated U.S. Attorney's Office <u>Laffey</u> matrix.  Plaintiffs support this calculation of rates with survey data from the *National Law Journal* for the District of Columbia and with declarations submitted by David W. DeBruin and Elizabeth B. McCallum. The declarants state that based on their experience in the District of Columbia legal market, and the quality of work done by the Bazelon Center, the rates proposed by the Bazelon Center are reasonable and in line with market rates for comparable work.  <u>See</u> Pet., Declaration of David W. Debruin ¶¶ 3, 5; Declaration of Elizabeth B. McCallum ¶ 9.[10]

In addition to plaintiffs' argument that their data shows that the Bazelon Center's hourly rates are in line with prevailing market rates, the plaintiffs rely on <u>Salazar v. District of Columbia</u>, 123 F. Supp. 2d 8 (D.D.C. 2000), in which Judge Kessler adopted the so-called "enhanced" <u>Laffey</u> matrix.  The enhanced <u>Laffey</u> matrix uses a different method for updating the cost of legal services in the District of Columbia area than does the United States Attorney's Office's updated <u>Laffey</u> matrix, and it results in higher hourly rates.[11]  While plaintiffs propose slightly lower rates than those in the enhanced <u>Laffey</u> matrix, they rely on <u>Salazar</u> for the

---

[10]    The Bazelon Center seeks compensation for Ira Burnim, Steven Ney and Andrew Penn at $600 an hour; Alison Barkoff and Lewis Bossing at $475 an hour; Tarnetta Jones and Deena Fox at $275 an hour; and Edith Coakley at $140 an hour.  <u>See</u> Pet., Declaration of Ira A. Burnim, ("Burnim Decl.") ¶ 44.

[11]    The United States Attorney's Office's <u>Laffey</u> matrix calculates inflation based on the metropolitan D.C. Consumer Price Index ("CPI"), while the "enhanced" <u>Laffey</u> matrix calculates inflation based on the legal services sub-component of the national CPI.

principle that the updated Laffey matrix does not prescribe the maximum allowable rates and that better methods may exist for determining prevailing market rates.

Defendants dispute the utility of the *National Law Journal* survey — arguing that it is not a scientific study and that it relied on self-reported rates, which firms may reduce in practice, and that those rates came from the largest and most prestigious law firms, not from a representative sampling of firms.  See Opp. at 9-10; Sur-Reply at 10-11.  They also argue that the declarants' statements that the Bazelon Center's rates are in line with market rates do not demonstrate that the rates are reasonable, because the declarants are comparing the rates to those charged by the largest and most expensive firms in the community, and plaintiffs have not shown that such expensive representation would be required for this case.  See Sur-Reply at 11; Tr. at 33.  Defendants argue that the Court should substitute the hourly rates in the updated United States Attorney's Office Laffey matrix.  The Court agrees with the defendants and will apply the 2008-09 U.S. Attorney's Office Laffey matrix to determine the appropriate hourly rate for each Bazelon Center lawyer and legal assistant.

Applying the United States Attorney's Office Laffey matrix, defendants agree that Mr. Burnim should be compensated at a rate of $465 an hour, Ms. Barkoff and Mr. Bossing at $330 an hour, Ms. Fox at $225 an hour, and Ms. Coakley at $130 an hour.[12]  Defendants argue, however, that the years of experience credited to Mr. Ney and Mr. Penn should be reduced based on the lack of evidence of these attorneys' federal litigation experience.  See Opp. at 12-13.

---

[12]     The number of years out of law school for each of these individuals and the nature and extent of their experience are outlined in Mr. Burnim's declaration.  See Burnim Decl. ¶¶ 11-25.  Defendants do not challenge the experience of any of these individual in complex federal litigation, except for Mr. Ney and Mr. Penn.

They assert that Mr. Ney, who has 37 years of experience, should be compensated at the rate of an attorney with 11 to 19 years of experience and that Mr. Penn, who has 32 years of experience, should be compensated as a first year litigator.  See id. at 12-13; Burnim Decl. ¶¶ 16, 20.  For the same reasons the Court declined to reduce the years of experience credited to the lawyers at Steptoe in order to establish their hourly billing rates, the Court will credit each of the Bazelon Center lawyers with their actual years of legal experience — including Mr. Ney, who will be credited with 37 years of experience, and Mr. Penn, who will be credited with 32 years of experience — for the purpose of determining the hourly rates at which they should be compensated under the 2008-09 U.S. Attorney's Office Laffey matrix.

## B. Number of Hours Billed

Defendants argue that plaintiffs' hours are excessive and are not properly documented.  Plaintiffs billed for just under 4400 hours for the 29 months of work for which they seek fees.  As the parties agree, this number of hours is equivalent to the work of one full time attorney working on the case for nearly two and one-half years.  Furthermore, before filing the fee petition, both Jane Ryan on behalf of Steptoe and Ira Burnim on behalf of the Bazelon Center exercised their billing judgment to eliminate (in Ms. Ryan's words) "time spent on work that was even arguably duplicative, excessive, unnecessary, or lacking in sufficient detail" or where a particular individual's contributions to the case were "de minimus in terms of hours."  Ryan Decl. ¶ 46; Burnim Decl. ¶ 40.  Each also reduced fees by 7% across the board, further reducing Steptoe's lodestar by $50,000 and the Bazelon Center's by approximately $95,000.  See Ryan Decl. ¶ 47; Burnim Decl. ¶ 41; Reply at 1 n.2.  The Court is persuaded that the equivalent of one

full-time attorney working on this matter is not excessive and, based upon the explanations

provided in their declarations for how they determined the final bill for attorneys' fees, finds that

Ms. Ryan and Mr. Burnim exercised reasonable billing judgment.  See Blackman v. District of

Columbia, 397 F. Supp. 2d 12, 14 (D.D.C. 2005) (sound billing judgment requires that legal

matters are "appropriately staffed to do the work required efficiently and without duplicative

billing.").

       The Court disagrees with defendants' argument that plaintiffs used too many

attorneys on the case and that adding the Steptoe attorneys at all was unnecessary.  While

numerous individuals worked on the case, more than 80% of the work was performed by eight

individuals, four each from the two entities seeking fees.  See Reply at 19.  Furthermore, as

plaintiffs' counsel pointed out at oral argument, the bulk of substantive, non-fees work was

performed by four lawyers, two from Steptoe and two from the Bazelon Center.  See Tr. at 53.

The Court concludes that this apportionment of work is reasonable for a case of this magnitude

and complexity.  See Heard v. District of Columbia, Civil Action No. 02-296, 2006 U.S. Dist.

LEXIS 62912 at *39 (D.D.C. Sept. 5, 2006).

       Defendants also challenge the number of hours billed for certain specific projects

undertaken by plaintiffs' counsel, including approximately 140 hours spent by Lindsey Lang on

the fee cap briefing;[13] 43 hours billed by Angela Scott for researching and opposing a July 2008

motion by a group of Hearing Officers to intervene in the case; 119 hours (or "three solid

weeks") billed by Steven Ney for researching and drafting plaintiffs' briefs on the District's

---

[13]     At oral argument, counsel for defendants indicated that they were no longer
suggesting a dramatic reduction in the number of hours spent by Ms. Lang on this activity, in
view of the importance of the issue.  See Tr. at 41-42.

14

responsibility for charter schools' implementation of Hearing Officer decisions and settlement agreements;[14] and time spent by the majority of plaintiffs' counsel working on case closure protocols in the summer of 2006.  See Opp. at 15-16; Sur-Reply at 4.[15]  The Court agrees with the defendants that in light of his experience, the time spent by Mr. Ney on the charter schools briefing was excessive.  The Court therefore will reduce the compensable number of hours for Nr. Ney's work on charter schools briefing by 30%.  The Court finds that the number of hours billed for each of the other specific projects challenged by defendants is reasonable.

Finally, defendants argue that too much of the work — in particular the monitoring work — was done by the most expensive attorneys.  They calculate the average billable hourly rate for such work at $441 per hour and request a 20% reduction based on this purported inefficiency.  The Court will not impose the requested reduction.  During the stage of this case for which plaintiffs seek fees, much of plaintiffs' class counsel's work involved working with class members, the Special Master, the Monitor, the Evaluation Team, and DCPS and OSSE officials to make programmatic improvements and to monitor the District's compliance with the Consent Decree.[16]  This work was essential to assuring that the defendants

---

[14]     Defendants urge the Court to reduce the fees for this activity by Mr. Ney by 50%.

[15]     Defendants also argue that the portion of Ms. Lang's time spent working on the instant fee petition should not be compensated now because the Court cannot determine whether the amount of time expended was reasonable until after deciding the amount of fees plaintiffs will receive.  This argument is unpersuasive and, in any event, because the Court has concluded that plaintiffs are entitled to the majority of the fees requested, it appears to the Court that Ms. Lang's work on this fees petition was of great utility to plaintiffs.  See Covington v. District of Columbia, 839 F. Supp. 894, 902 (D.D.C. 1993) (prevailing party may receive attorneys' fees for time spent on fees petition), aff'd, 57 F.3d 1101 (D.C. Cir. 1995).

[16]     The Consent Decree expressly anticipates that plaintiffs' class counsel receive fees for time spent for monitoring, implementing and enforcing the Consent Decree, all of which

meet their obligations under the Consent Decree.  As the Court pointed out at oral argument, working cooperatively with the defendants, rather than engaging in motions practice if unnecessary, was a wise strategic choice by plaintiffs' counsel.  See Tr. at 47.  Involving the lead attorneys for the plaintiffs' class in the monitoring work was appropriate because so much of the work at this stage required the maturity and judgment that only an experienced lawyer can provide.  Participation in the monitoring work gave the senior attorneys the knowledge necessary to make strategic decisions about the case and to engage in productive discussions and negotiations with defendants' counsel.

### C.  Adequacy of Billing Records

Defendants argue that plaintiffs' total award should be reduced by 20% for inadequate billing detail.  In particular, they argue that the time records of Mr. Ney and Ms. Ryan provide only vague descriptions for the work performed and are billed in blocks.  For example, defendants challenge entries such as one by Mr. Ney for 2.7 hours for:  "Memo draft protocols, research, phone call," and one by Ms. Ryan for one hour to: "Address logistical issues for meetings; and review file."  See Opp. at 17-18.[17]  They also provide an exhibit to their sur-reply in which they annotate the first page of time entries for each billing professional to note the

---

are recognized as important activities.  See Consent Decree ¶ 145.

[17]     Defendants also argue that Ms. Ryan's records are inadequate because they bill primarily in half-hour increments rather than tenths of an hour.  See Opp. at 18.  Arguing that this method of billing fails to meet plaintiffs' burden to prove Ms. Ryan's billed time accurately reflects her efforts, defendants request a 25% reduction.  In their reply, plaintiffs clarify that while certain of Ms. Ryan's entries end in .50 or .00, she does not bill in 30 minute increments; rather she bills in 10 or 15 minute increments.  In addition, plaintiffs note that Ms. Ryan never bills for tasks that consume less than 15 minutes and rounds down whenever a task fails to fill the next full increment.  See Rep. at 27 n.18.

defects they perceive.  Defendants extrapolate from these entries to conclude that plaintiffs' bills should be reduced across the board.

In support of their arguments about the asserted inadequacies of plaintiffs' time records, defendants rely heavily on Role Models America, Inc. v. Brownlee, 353 F.3d 962 (D.C. Cir. 2004).  As the Court stated in its recent attorneys' fees opinion in the Petties case, numerous factors distinguish Role Models from cases such as Petties and Blackman:

> As Judge Kessler has pointed out, the opinion in Role Models "must be viewed in context" — an extraordinarily high bill for a garden variety case.  Smith v. District of Columbia, 466 F. Supp. 2d 151, 157 (D.D.C. 2006).  "[T]he ruling in Role Models simply cannot be blindly applied without being mindful of the factual context in which it was decided."  Id. at 158; see also DL v. District of Columbia, 256 F.R.D. 239, 246 (D.D.C. 2006) (when fee request is "unreasonable on its face," as in Role Models, the court should scrutinize time records "with a more demanding eye").  In Role Models, counsel expended minimal effort — as the case required "no discovery, no travel, no evidentiary hearings, no contested facts, and no petitions for rehearing" — yet requested fees dramatically disproportionate to the work required.  Smith v. District of Columbia, 466 F. Supp. 2d at 157; see id. at 161.

Petties v. District of Columbia, Civil Action No. 95-0148, Opinion and Order, Dkt. No. 1694 at 12-13 (Oct. 20, 2009).  As with Petties, this case provides a stark contrast to Role Models.  It has been actively litigated for twelve years, during which time plaintiffs' class counsel have contested numerous legal issues, negotiated a Consent Decree, and worked with the Special Master, the Monitor and the Evaluation Team to monitor defendants' compliance with the Consent Decree and federal law.

The Court concludes that the billing records are adequate.  The Court has reviewed the time entries challenged by defendants in their briefs and in the exhibit to their Sur-

Reply and is not persuaded by defendants' arguments that the entries are deficient.  While

defendants argue that certain entries have insufficient detail or that it is not apparent why certain

work was being done, see Sur-Reply, Ex. A at 1, when reviewed by an individual with

knowledge of the case, and in light of the surrounding entries, virtually all of the entries provide

sufficient information to determine what work was performed and why it was relevant to the

case.  Defendants also argue that many of the entries contain block billing — a term that refers to

a single time entry that lists multiple tasks.  See id.  Upon review, it appears that most of the

entries of which defendants complain do not actually lump multiple tasks together and the

relatively few entries that do contain more than one task are of relatively minor significance and

amount to minimal time.  Finally, defendants argue that certain work performed is non-legal,

administrative or that it is not relevant to monitoring the Consent Decree.  See id. The Court has

reviewed the entries and is not persuaded by defendants' argument.  As discussed above, the

Consent Decree requires plaintiffs' class counsel to play an active role in monitoring and

enforcing defendants' compliance with the Consent Decree; the vast majority of the challenged

entries plainly fall within the scope of this work.  The Court also concludes that plaintiffs' class

counsel did not bill for an unreasonable amount of non-legal or administrative work.  To the

extent that any billing records are deficient, plaintiffs have compensated for this deficiency with

their 7% across the board reduction in fees requested.

### D.  Defendants' Supplemental Challenge to Paying Plaintiffs' Fees and Costs

On October 27, 2009, defendants filed a motion for leave to file a supplement to

their opposition to plaintiffs' motion for attorneys' fees and costs, which the Court granted.

18

Defendants argue, as they did in a similar motion filed in the Petties case, that any order that requires them to pay more than $4,000 for attorneys' fees violates the current federal appropriations act for the District of Columbia.  Specifically they wish to resurrect their argument that the congressionally imposed fee cap of $4,000 for a proceeding under the IDEA in the District of Columbia applies in this litigation.  See Pub. L. No. 111-8; 123 Stat. 524, § 814 (2009).  As defendants recognize, the Court has already considered this argument and rejected it.  With respect to an earlier iteration of the fee cap which used the same relevant language, the Court stated:

> The plain and unambiguous language of the fee cap statute specifically precludes the District from paying fees in excess of $ 4000 to "an attorney who represents a party in an action" under the IDEA.  See Pub. L. No. 109-115, 119 Stat 2396, 2519 (2005). Class counsel in each of these cases, however, is not "an attorney who represents a party in an action" — class counsel in Petties and class counsel in Blackman/Jones represent hundreds and/or thousands of parties.  As a result, the Court concludes that the cap does not preclude the Court from ordering defendants to pay and — more importantly — does not preclude the defendants from paying reasonable attorneys' fees to the plaintiff classes, so long as the total amount paid by the defendants does not surpass the statutory fee cap multiplied by the total number of members of the plaintiff class.

Petties v. District of Columbia, 538 F. Supp. 2d 88, 96 (D.D.C. 2008).  Defendants have given the Court no reason to change its earlier ruling, and it will not do so.

For the reasons stated above, the Court will grant plaintiffs' petition for attorneys' fees in part and deny it in part.  An Order consistent with this Opinion will issue this same day.

_/s/_____
PAUL L. FRIEDMAN
DATE: January 4, 2010                         United States District Judge